227 F.Supp.2d 1276 (2002)
AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES; Daniel W. O'Conner; Kent Bell; and Beth Bowen, Plaintiffs, on behalf of themselves and others similarly situated,
v.
Jim SMITH, as Secretary of State for the State of Florida; Edward C. Kast, as Director, Division of Elections; John Stafford, as Supervisor of Elections in Duval County, Florida; Warren Alvarez, Elaine Brown, Matt Carlucci, Doyle D. Carter, Gwen Chandler-Thompson, Lad Daniels, Reggie Fullwood, Alberta Hipps, Jerry Holland, King Holzendorf, Suzanne Jenkins, Pat Lockett-Felder, Jim Overton, Lake Ray, III, Faye Rustin, Lynette Self, Ginger Soud, Mary A. Southwell, and Gwen Yates, as Members of the Jacksonville, Florida City Council, Defendants.
No. 3:01-CV-1275-J-21TJC.
United States District Court, M.D. Florida, Jacksonville Division.
October 16, 2002.
*1277 *1278 James Douglas Baldridge, Alan M. Wiseman, Danielle R. Oddo, Courtney O. Taylor, Vincent E. Verrocchio, Howrey, Simon, Arnold & White, LLP, Washington, DC, Lois F. Williams, Washington Lawyers Committee for Civil Rights & Urban Affairs, Washington, DC, for plaintiffs.
Tracey I. Arpen, Jr., Jason R. Teal, General Counsel's Office, Jacksonville, FL, Charles A. Finkel, Atty. General's office, Corrections Lit. Branch, Tallahassee, FL, Scott D. Makar, Office of Gen. Counsel, Jacksonville, FL, for defendants.

ORDER
NIMMONS, District Judge.
This is an action[1] brought by an organization of people with disabilities, as well as by certain visually and manually impaired voters, against state and local election officials and members of the City Council of Jacksonville, claiming violation of the Americans with Disabilities Act, the Rehabilitation Act of 1973, and Article VI, Section 1, of the Florida Constitution.
Before the Court are the following motions: (1) Defendants Smith and Kast's Motion to Dismiss (Dkt.5) and Plaintiffs' Response (Dkt.8) in opposition thereto; and (2) Defendants Stafford, Alvarez, Brown, Carlucci, Carter, Chandler-Thompson, Daniels, Fullwood, Hipps, Holland, Holzendorf, Jenkins, Lockett-Felder, Overton, Ray, Rustin, Self, Soud, Southwell, and Yates' Motion to Dismiss (Dkt.6) and Plaintiffs' Response (Dkt.9) in opposition thereto. The Court has considered the parties' written submissions, oral arguments and applicable authorities.

I. The Parties and the Alleged Facts[2]
Plaintiff American Association of People with Disabilities (AAPD) is a nonprofit organization whose purpose is to advocate the interests of persons with disabilities. Some of AAPD's members are registered voters in Duval County with visual and manual impairments. Plaintiffs Bell and Bowen are visually impaired persons registered to vote in Duval County. Plaintiff O'Conner is manually impaired such that he cannot manipulate a writing instrument or touchscreen, and is registered to vote in Duval County.
Defendants Alvarez, Brown, Carlucci, Carter, Chandler-Thompson, Daniels, Fullwood, Hipps, Holland, Holzendorf, Jenkins, Lockett-Felder, Overton, Ray, Rustin, Self, Soud, Southwell, and Yates are all members of the City Council of the City of Jacksonville (Council). Defendant *1279 Stafford is the Supervisor of Elections of Duval County. Defendant Smith is the Secretary of State of the State of Florida, and Defendant Kast is the Director of the Division of Elections, a division of the office of the Secretary of State.[3]
Plaintiffs are unable to vote unassisted with the equipment currently used in Duval County or the equipment the County has recently purchased. In order to vote, Plaintiffs Bell and Bowen rely on the assistance of third parties to read the ballot to them and to mark their selection. For Plaintiff O'Conner to vote, he must rely on the assistance of a third party to mark his selection on the ballot.
The Secretary of State and the Director of the Division of Elections must approve any voting systems to be used in Florida. Thus, before a county may purchase a voting system, it must have been certified by the Secretary of State and the Director of the Division of Elections. Six optical scan voting systems and one touchscreen voting system have been so certified by the Secretary of State and the Director of the Division of Elections. While Plaintiffs had asked the former Secretary of State, Katherine Harris, and the former Director of the Division of Elections, L. Clayton Roberts, to certify voting systems that allow visually and manually impaired voters to vote unassisted, visually and manually impaired voters are unable to access any of the presently certified voting systems for purposes of unassisted voting. Only the certified touchscreen system could potentially be used by Plaintiffs to vote unassisted; to provide for unassisted voting, it would need to be modified with audio and so-called "puff stick" equipment.
Supervisor of Elections Stafford and the City Council are responsible for selecting and purchasing voting systems to be used in Duval County. Defendants Stafford and the Council decided to purchase optical scan voting equipment despite knowing that such systems did not allow visually and manually impaired voters to vote unassisted. In addition, Defendants Stafford and the Council decided to purchase up to four touchscreen voting systems for the County but failed to purchase the audio and puff stick equipment necessary for visually and manually impaired voters to vote unassisted. Also, these touchscreen systems were only to be located at voting headquarters.
Plaintiffs filed suit alleging that Defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794, and that Sections 101.051,101.28, and 101.5606, Florida Statutes, violate Article VI, Section 1 of the Florida Constitution. Plaintiffs allege that Defendants Smith's and Kast's predecessors violated the ADA, the Rehabilitation Act, and Article VI, Section 1 of the Florida Constitution by certifying voting systems that do not allow visually and manually impaired voters to vote unassisted. Plaintiffs allege that Defendants Stafford and the Council violated the ADA, the Rehabilitation Act, and Article VI, Section 1 of the Florida Constitution by deciding to purchase voting equipment that would not allow visually and *1280 manually impaired voters to vote unassisted. In addition, Plaintiffs allege that Sections 101.051, 101.5606, 101.28, Florida Statutes, violate Article VI, Section 1 of the Florida Constitution.

II. Motion to Dismiss Standard
It is well established that "a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would not be entitled to recover under any state of facts which could be proved in support of his claim." Cook & Nichol, Inc. v. Plimsoll Club, 451 F.2d 505, 506 (5th Cir.1971); accord Conley v. Gibson, 355 U.S. 41, 47-48, 78 S.Ct. 99, 2 L.Ed.2d 80, 84 (1957). In evaluating the sufficiency of a complaint for purposes of a motion to dismiss, the allegations of the complaint must be accepted as true, Hishon v. King & Spalding, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and viewed in a light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Nevertheless, when the allegations in a complaint are wholly conclusory and fail to set forth facts which, if proved, would warrant relief for the plaintiff, dismissal is appropriate. Davidson v. State of Georgia, 622 F.2d 895, 897 (5th Cir.1980).[4]
With regard to dismissing a complaint with prejudice, the general rule in the Eleventh Circuit is that where a "more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." Bank v. Pitt 928 F.2d 1108, 1112 (11th Cir.1991). Two exceptions exist: (1) where the plaintiff expresses a desire not to amend his or her complaint; and (2) where "a more carefully drafted complaint could not state a claim under the standard of Conley, 355 U.S. at 45-46, 78 S.Ct. at 102, [2 L.Ed.2d at 84], dismissal with prejudice is proper." Id.

III. Discussion

A. Summary of Contentions
Defendants Smith and Kast assert that Plaintiffs failed to allege that they or their predecessors were presented with a voting system that would allow visually and manually impaired voters to vote unassisted.[5] Consequently, Defendants Smith and Kast argue the claim is not ripe and that Plaintiffs lack standing. In addition, Defendants Smith and Kast assert that they do not have a duty to ensure that local election officials apply the ADA uniformly. Instead, Defendants Smith and Kast contend that they have the discretion to adopt rules that establish minimum standards for voting systems. Thus, while they have the discretion to adopt rules requiring voting systems that allow visually and manually impaired voters to vote unassisted, Defendants Smith and Kast assert that they have no duty to adopt such rules. Defendants Smith and Kast also assert that Plaintiffs failed to state a claim under the Rehabilitation Act because they did not *1281 adequately allege that their respective offices received federal financial assistance.
Defendants Stafford and Council assert that the ADA only requires that disabled voters not be excluded from voting. Therefore, Stafford and Council argue, the ADA does not create a federal right to absolute "direct or secret voting." Similarly, Defendants Stafford and Council assert that state law does not create a right to unassisted voting. Since neither the ADA nor Florida law creates a right to a completely direct and secret vote, Stafford and Council argue that the ADA is not violated. In addition, Defendants Stafford and Council assert that Plaintiffs fail to state a claim under the Rehabilitation Act because they do not adequately allege that they receive federal financial assistance. Defendants Stafford and Council also assert that Sections 101.051, 101.5606, and 101.28 do not violate Article VI, Section 1 of the Florida Constitution. Also, the members of the Jacksonville City Council assert that they are entitled to absolute legislative immunity.

B. Ripeness and Standing
Defendants Smith and Kast assert that the action against them is not ripe and that Plaintiffs lack standing. They argue that the action is not ripe because, under Florida law, counties select voting systems for possible purchase and submit them to the Department of State for approval. Since no county has presented voting equipment for approval that allows visually and manually impaired voters to vote unassisted, Defendants Smith and Kast assert that neither they nor their predecessors have done anything to deny Plaintiffs the benefits of services, programs, or activities, and that the suit, at least as to Smith and Kast, is therefore not ripe. Defendants Smith and Kast also argue Plaintiffs lack standing because they have failed to adequately establish a likelihood of future injury. Defendants Smith and Kast contend that, because Plaintiffs failed to allege that they or their predecessors were presented for certification with voting equipment that permits visually and manually impaired voters to vote unassisted, Smith and Kast have not caused Plaintiffs to suffer an injury and Plaintiffs are not likely to suffer an injury in the future.
Plaintiffs respond, however, that the suit is ripe because Defendants Smith and Kast and their predecessors had a duty to certify voting systems that allowed visually and manually impaired voters to vote unassisted. Plaintiffs argue that this duty is predicated on Plaintiffs' having requested that Defendants Smith's and Kast's predecessors certify such voting equipment and on Defendants Smith's and Kast's Florida statutory duties. Plaintiffs contend that Defendants Smith and Kast have an independent duty under Florida law to only certify voting equipment allowing visually and manually impaired voters to vote unassisted. In addition, Plaintiffs assert that Defendants Smith's and Kast's predecessors were presented with such a voting system for certification because Plaintiffs allege that they had asked Defendants Smith's and Kast's predecessors to certify such voting systems.
Standing and ripeness are justiciability issues that arise within the context of the Article III, United States Constitution, requirement that an actual case or controversy is a necessary predicate to federal court jurisdiction. See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1309 (11th Cir.2000). To determine whether a claim is ripe, a court must consider the fitness of the issues for judicial determination and whether failing to decide the matter will cause hardship to the parties. See id.
*1282 A determination of whether a case is fit for judicial determination requires a court to consider whether there is sufficient injury to satisfy the Article III case or controversy requirement and whether the case is sufficiently defined to allow the court to effectively decide the case. See id. To determine whether a plaintiff has standing to bring a claim, the plaintiff must establish "(1) that the plaintiff has suffered an actual or threatened injury; (2) that the injury is fairly traceable to the challenged conduct of the defendant; and (3) that the injury is likely to be redressed by a favorable ruling." Nat'l Ass'n of Gov't Employees v. Barrett, 968 F.Supp. 1564, 1569 (N.D.Ga.1997) (citing Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 471-72, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).
The ripeness and standing arguments are premised on the contention that Defendants Smith and Kast and their predecessors have not had the opportunity to certify equipment that would allow visually and manually impaired voters to vote without assistance. Thus, Defendants Smith and Kast argue, the suit is not ripe because Defendants Smith and Kast and their predecessors have not yet denied certification of such equipment and Smith and Kast may not do so. Until they deny certification, Defendants Smith and Kast contend, Plaintiffs have not been injured by them or their predecessors.
It is not clear to the Court, however, whether the Secretary of State and the Director of the Division of Elections have certified, or may certify, voting systems without the system having been presented by a county seeking to purchase the system. There was some discussion at the hearing on the Motions to Dismiss regarding a list of approved systems. It is not clear whether the voting systems on this list were previously approved when counties brought them before the Secretary of State and the Director of the Division of Elections or whether they were sua sponte approved. If Defendants Smith and Kast have the power to sua sponte certify voting systems or to certify them based on Plaintiffs' alleged request therefor, then Plaintiffs have adequately alleged the existence of an actual or threatened injury caused by conduct of Defendants Smith and Kast or their predecessors that could be redressed by a favorable decision of this Court. In addition, the case would be sufficiently defined to allow the Court to effectively decide the case. Consequently, the Court cannot say that Plaintiffs would be unable to prove any state of facts that would satisfy the ripeness and standing requirements.[6]

C. Article VI, Section 1, Florida Constitution (Count Two)
Plaintiffs assert that Article VI, Section 1 of the Florida Constitution, which provides for "direct and secret" voting, necessarily confers upon visually and manually impaired voters a Florida constitutional right to be provided a method of unassisted voting. Thus, Plaintiffs assert that Defendants Smith's and Kast's predecessors violated Article VI, Section 1 of the Florida Constitution by certifying a voting system that does not permit visually and manually impaired voters to vote without assistance and that Defendants Stafford and the Council violated Article VI, Section 1 of the Florida Constitution by purchasing *1283 a voting system that does not permit visually and manually impaired persons to vote without assistance. In addition, Plaintiffs assert that Sections 101.051, 101.5606, and 101.28, Florida Statutes, violate Article VI, Section 1 because they do not specifically provide for "direct and secret" voting such that visually and manually impaired voters are able to vote without assistance.
Thus, it appears that there are two reasons why the Court is called upon to determine whether Article VI, Section 1 guarantees that visually and manually impaired voters be provided a means of voting without assistance: (1) first, because of Plaintiffs' claim that the above Florida statutory sections are violative of Article VI, Section 1's alleged requirement of unassisted voting for such voters; and (2) second, because, in determining Plaintiffs' federal claims under the ADA and the Rehabilitation Act, it is necessary to determine whether the "program or activity" from which the disabled voter/plaintiffs are allegedly being excluded or being denied the benefits thereof, is a program or activity requiring voting without assistance.
Defendants Smith and Kast assert that the Court, under the Pullman[7] abstention doctrine, should abstain from deciding upon the constitutionality (under the Florida Constitution) of the above referred Florida statutory sections. Pullman abstention is clearly not applicable here if for no other reason than the fact that there are no federal constitutional issues before this Court to be avoided by such abstention. See Pittman v. Cole, 267 F.3d 1269 (11th Cir.2001); Siegel v. Lepore, 234 F.3d 1163 (11th Cir.2000); Rindley v. Gallagher, 929 F.2d 1552 (11th Cir. 1991). Secondly, Defendants Smith and Kast's assertion of the applicability of Pullman abstention is expressly based upon the assumption that the Court will find that Plaintiffs have failed to allege a case or controversy under the ADA or the Rehabilitation Act. See Motion to Dismiss of Smith and Kast (Dkt. 5 at p. 9).
Defendants do not assert any of the other abstention doctrines.[8] The Court's own review of the applicable authorities indicates the inapplicability of such other abstention theories although Burford abstention would seem to come closer than abstention under Pullman. But the purpose of Burford appears to principally be directed to the protection of complex state administrative processes from undue federal interference. New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 362, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989); Boyes v. Shell Oil Products, 199 F.3d 1260, 1265 (11th Cir. 2000); Election 2000: The Law of Tied Presidential Elections, 26 Nova L.Rev. 647, 761 (Spring 2002).
Nor have Defendants Smith and Kast asserted that the Court should exercise its discretion in declining, under 28 U.S.C. § 1367(c), supplemental jurisdiction over the Count II claim. Subsection (c)(1) of Section 1367 provides that the district court may decline to exercise supplemental jurisdiction over the state claim if "the claim raises a novel or complex issue of State law." However, the issue of whether the above Florida statutory sections are violative of the Florida Constitution are, as *1284 previously indicated above, so intertwined with the federal claims in Counts One (ADA) and Three (Rehabilitation Act) that to decline supplemental jurisdiction over Count Two would appear to be an abuse of the Court's discretion.
The Court also notes that it does not have the option of certifying a question to the Florida Supreme Court. While the Florida Supreme Court has jurisdiction to "review a question of law certified by the Supreme Court of the United States or a United States Court of Appeals which is determinative of the cause and for which there is no controlling precedent of the supreme court of Florida," FLA. CONST. art. V, § 3(b)(6), it does not have jurisdiction to review a question of law certified by a federal district court. Thus, pursuant to Defendants' Motions to Dismiss, the Court must address whether Plaintiffs have stated a claim in Count Two. And that depends upon the answer to the question of whether the Florida Constitution guarantees visually and manually impaired voters the right to be provided a method of unassisted voting.
Florida's Constitution provides that "[a]ll elections by the people shall be by direct and secret vote." FLA. CONST. art. VI, § 1. This language became part of the Florida Constitution in 1968 when a joint resolution of the Florida House and Senate, see S.J.R. 4-2X, Spec. Sess.1968, placed the change on the ballot and the language was adopted. When interpreting a constitutional provision, the fundamental goal is to give effect to the intent of the framers. See State ex rel. Dade County v. Dickinson, 230 So.2d 130, 135, (Fla.1969). "Ambiguity is an absolute prerequisite to judicial construction." Florida League of Cities v. Smith, 607 So.2d 397, 400 (Fla. 1992). If a provision is ambiguous, a court should "`focus primarily on factors that inhere in [the state's unique experience], such as the express language of the constitutional provision, its formative history, both preexisting and developing state law, evolving customs, traditions and attitudes within the state, [the] state's own general history, and finally any external influences that may have shaped state law.'" Mozo v. State, 632 So.2d 623, 630 (Fla.App.4th DCA 1994), rev' g 640 So.2d 1108, (Fla. 1994), remanded on other grounds 655 So.2d 1115 (Fla.1995), (quoting Traylor v. State, 596 So.2d 957, 962 (Fla.1992)). If a constitutional provision could have more than one meaning and the Legislature has adopted one meaning by enacting a statute, the Legislature's interpretation is persuasive, if not controlling. See Greater Loretta Imp. Ass'n v. State ex rel. Boone, 234 So.2d 665, 669 (Fla.1970).
A Florida Court could interpret the Florida Constitutional provision at issue as requiring the provision of a method by which visually and manually impaired voters may vote without assistance so as to avoid anyone but the voter knowing how the vote was cast. However, a Florida Court could also interpret the language at issue as being satisfied by the assistance provided by Section 101.051, Florida Statutes.[9] Consequently, Article VI, Section 1 of the Florida Constitution is ambiguous.
*1285 According to Black's Law Dictionary, "direct" is defined as "straight; undeviating[;] ... straightforward[;] ... [f]ree from extraneous influence; immediate[;] ... [o]f or relating to passing in a straight line of descent, as distinguished from a collateral line[;] ... effected by the public immediately, not through representatives." Black's Law Dictionary (7th ed.1999). "Secret" is defined as "[s]omething that is kept from the knowledge of others or shared only with those concerned[;] ... [i]nformation that cannot be disclosed without a breach of trust; specif., information that is acquired in the attorney-client relationship." Blacks's Law Dictionary (7th ed.1999). The definitions of these words do not clearly point to either of the meanings advanced by the respective parties, and thus are not dispositive of the issue.
While the term "direct" could be read to support Plaintiffs' interpretation (absolute directness), it also could be construed as contemplating a more flexible interpretation which gives emphasis to the element "free from extraneous influence." If a Florida court were to choose the latter definition, the provisions of Section 101.051, which provides that the person(s) providing the assistance must read the ballot to the voter "without suggestion or interference" and that "after the [voter] requests the aid of the [person(s) providing assistance], they shall retire to the voting booth for the purpose of casting the elector's vote according to the [voter's] choice," (emphasis added), would arguably satisfy this requirement of directness.
Similarly, the term "secret" could be construed to support both Plaintiffs' and Defendants' positions. While the term may be read to mean absolute secrecy, it also may be construed less restrictively so as to contemplate information known only by a few or information not publicly known. The assistance provided by Section 101.051 would not appear to violate the latter meaning because only one or two people aside from the voter would know for whom the person voted, and Section 104.23, Florida Statutes, makes it a third degree felony for someone assisting a voter to disclose how the voter voted.
Few cases have dealt with the meaning of the current language of Article VI Section *1286 1. In Boardman v. Esteva, 323 So.2d 259, 269 (Fla.1975), the Florida Supreme Court considered whether a procedure used to canvass absentee ballots violated the Florida Constitutional provision of secrecy. The canvassing procedure required "the Hillsborough County Canvassing Board to assign a number to each absentee elector for purposes of maintaining the integrity of the ballots and votes for purposes of judicial review." Id. The Court noted that traditionally under Florida law, when a voter opts to vote by absentee ballot, the voter waives secrecy of the ballot. See id. While the Court did not decide that there had been such a waiver, it observed that the plaintiff did not assert that the right of secrecy was violated when the absentee ballots were cast. See id. Instead, the canvassing procedure was used to maintain the integrity of the ballots for judicial review. See id. The Court emphasized that there was no contention that the voters were in any way influenced in their voting by the canvassing procedure or that a violation of secrecy actually occurred. See id. Thus, the Court held that the absentee ballots "were not invalidated by reason of a violation of the right of secrecy of the ballot." Id.
While no actual violation of the right of secrecy was found in Boardman, the case illustrates that a Florida court interpreting the requirements of Article VI Section 1 places emphasis on whether the affected voters were influenced in their voting. The concern with a voter's decision being influenced by others also appears to have been a primary motivation behind the historic right to secrecy under the Florida Constitution. The current language of Article VI Section 1 replaced former Article VI Section 6, which provided that "in all elections by the people, the vote shall be by ballot," FLA CONST. Art. VI § 6 (1885). "The material guaranty of this constitutional mandate of vote by ballot is inviolable secrecy as to the person for whom an elector shall vote." State ex rel. Smith v. Anderson, 26 Fla. 240, 8 So. 1, 5 (1890). This right to secrecy was intended to protect voters from the conduct of others, see Bowden v. Carter, 65 So.2d 871, 874 (1953), and to ensure that no one was in a position to question a voter's decision, see State v. Tucker, 106 Fla. 905, 143 So. 754, 756 (1932).
Thus, it appears that both the current Florida Constitutional right to secrecy and its predecessor are premised, at least in part, upon a concern that one's vote not be influenced by others. This premise supports the interpretation that Article VI, Section 1 is satisfied by the assistance provided in Section 101.051 because Sections 101.051 and 104.23 (making it a third degree felony for someone assisting a voter to disclose how the voter voted) go to significant lengths to prevent someone providing assistance to voters from influencing their voting.
Similarly, the Legislature has, at least tacitly, interpreted the "direct and secret" language as having been satisfied by the assistance provided by Section 101.051. As noted above, if a constitutional provision is susceptible to more than one meaning and the Legislature has adopted one meaning by enacting legislation, the Legislature's interpretation is persuasive if not controlling. See Greater Loretta Imp. Ass'n, 234 So.2d at 669. At the time the Legislature passed the joint resolution placing the "direct and secret" language on the ballot in 1968, a previous version of Section 101.051 provided assistance to illiterate and disabled voters.[10] Section *1287 101.051 was subsequently amended by the Legislature in 1977, see 1977 Fla. Laws ch. 77-175 § 13; in 1979, see 1979 Fla. Laws ch. 79-366 § 2; in 1984, see 1984 Fla. Laws ch. 84-302 § 31; in 1985, see 1985 Fla. Laws ch. 85-226 § 12; in 1995, see 1995 Fla. Laws ch. 95-147 § 553; and in 1999, see 1999 Fla. Laws ch. 99-6 § 8. Under all versions of Section 101.051, assistance was provided to disabled and illiterate voters. Since legislators are sworn to uphold the constitution, see Williams v. Smith, 360 So.2d 417, 421 n. 9 (Fla.1978), and when possible statutes are to be construed as constitutional, see In re T.W., 551 So.2d 1186, 1201 (Fla.1989), there is a presumption that, in allowing an earlier version of Section 101.051 to remain in effect when the "direct and secret" language was added to the Constitution and in amending Section 101.051 over the years, the Legislature interpreted the "direct and secret" language as being satisfied by the assistance provided to disabled and illiterate voters.[11]
In light of the different potential interpretations of the "direct and secret" language in Article VI Section 1, the Florida courts' focus on the absence of influence on a person's vote under the right of secrecy, the apparent interpretation of this language by the Legislature, and the presumption in favor of the validity of statutes, this Court holds that the Florida Supreme Court would interpret the "direct and secret" language of the Florida Constitution as being satisfied by the assistance provided in Section 101.051.
*1288 Thus, Defendants Smith and Kast and their predecessors did not violate Article VI, Section 1, Florida Constitution by certifying voting equipment that does not allow visually and manually impaired voters to vote without assistance. Similarly, Defendants Stafford and the Council did not violate Article VI, Section 1, Florida Constitution, by purchasing voting equipment that does not permit visually and manually impaired voters to vote without assistance. In addition, Sections 101.5606[12] and 101.28,[13] Florida Statutes, do not violate *1289 Article VI, Section 1, Florida Constitution. Nothing provided for in these sections contravenes Article VI, Section 1, Florida Constitution, as interpreted above.

D. ADA (Count One) and Rehabilitation Act (Count Three)
As discussed above in Section C hereof, Article VI, Section 1 of the Florida Constitution provides for a program, activity, or service of direct and secret voting that is properly interpreted to permit the kind of assistance provided in Section 101.051, Florida Statutes. The question still remains, however, whether the program, activity, or service provided violates the ADA or the Rehabilitation Act. Title II of the ADA provides:
Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
42 U.S.C. § 12132; see also 28 C.F.R. § 35.130(a). Thus, "[t]o state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a `qualified individual with a disability;' (2) that he was `excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity' or otherwise `discriminated [against] by such entity;' (3) `by reason of such disability.'" Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir.2001) (alteration in original).
Section 504 of the Rehabilitation Act provides:
No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
29 U.S.C. § 794(a). Thus, to state a cause of action under both the ADA and the Rehabilitation Act, a plaintiff must allege that he or she is a qualified individual with a disability who was excluded from participation in a program or activity, denied the benefits of a program or activity, or subjected to discrimination because of said disability. The Rehabilitation Act has an additional requirement that the program or activity receive federal financial assistance.
*1290 In view of the basic similarities of the provisions of Title II of the ADA and Section 504 of the Rehabilitation Act,[14] the parties have addressed in their briefs Counts One and Three together except, of course, as to the above mentioned additional federal funding requirement of the Rehabilitation Act. The Court will likewise do so.
Defendants do not appear to contend that Plaintiffs have failed to allege that they are or represent qualified individuals with disabilities or that Defendants represent public entities. Instead, Defendants contend that Plaintiffs have failed to allege that they were excluded from participation in or denied the benefits of the services, programs, or activities provided by the Defendants. Defendants argue that since Plaintiffs are able to vote with assistance, they have not been excluded from participating in or denied the benefits of the service, program, or activity.
Section 35.149 of the Code of Federal Regulations[15] provides:
Except as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.
28 C.F.R. § 35.149. A facility is defined as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 35.104 (emphasis added).
The regulations distinguish between the accessibility of services, programs, or activities in facilities constructed[16] on or before January 26, 1992, and those in facilities constructed or altered after January 26, 1992. See Ass'n for Disabled Ams. v. City of Orlando, 153 F.Supp.2d 1310, 1317 (M.D.Fla.2001). For facilities constructed on or before January 26, 1992, a public entity need not necessarily modify each facility so as to make it accessible for disabled individuals, but must operate a service, program, or activity such that it is readily accessible and usable by such individuals when viewed in its entirety. See 28 C.F.R. § 35.150(a).[17]
For facilities altered or constructed after January 26, 1992, a "heightened standard is applied." Ass'n for Disabled Ams., 153 F.Supp.2d at 1318. With respect to *1291 post January 26, 1992, alterations of facilities, the regulations require:
(b) Alteration. Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.
28 C.F.R. § 35.151(b) (emphasis added).
In Shotz v. Cates, 256 F.3d 1077, 1079-81 (11th Cir.2001), the Eleventh Circuit, reviewing a district court's order of dismissal, considered whether facilities were readily accessible to individuals with disabilities. In Shotz,[18] the plaintiffs alleged that the county courthouse was not readily accessible because of architectural barriers such as ramps with excessive slopes and bathroom stalls with insufficient floor space. The court ruled that Title II of the ADA is not restricted to those situations in which "a disabled person is completely prevented from enjoying a service, program, or activity." Id. at 1080 (emphasis added). Rather, the court said that "if the ramps are so steep that they impede a disabled person or if the bathrooms are unfit for the use of a disabled person, then it cannot be said that the trial is `readily accessible,' regardless whether the disabled person manages in some fashion to attend the trial." Id. (quoting 28 C.F.R. § 35.150) (emphasis added).
Similarly, the Rehabilitation Act requires that qualified individuals with a disability be provided meaningful access to programs or activities receiving federal financial assistance. See Alexander v. Choate, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). In Alexander, the State of Tennessee proposed to reduce from twenty to fourteen hospital days for which Tennessee Medicaid would pay. Undisputed statistical evidence indicated that 27.4% of all disabled persons hospitalized required stays in excess of fourteen days while only 7.8% of nondisabled hospital patients required stays in excess of fourteen days. The Court considered whether this change excluded disabled persons from or denied them the benefits of the coverage provided by the Tennessee Medicaid program. See id. at 302, 105 S.Ct. 712. The Court ruled that Section 504 requires that qualified individuals with disabilities be provided meaningful access to the benefits of the program. See id. at 301, 105 S.Ct. 712. The Court held that the plaintiffs were provided meaningful access because there was no evidence that the fourteen-day limitation denied the plaintiffs meaningful coverage under the Tennessee Medicaid program. See id. at 302, 105 S.Ct. 712. The plaintiffs would be entitled to the same meaningful coverage as nondisabled persons. See id.
In the instant case, Plaintiffs have alleged that voting equipment approved by Defendants Smith's and Kast's predecessors and purchased by Defendants Stafford and the Council is not "readily accessible" to visually and manually impaired voters. In light of the facts alleged in the Complaint, the Court cannot say with certainty that the Plaintiffs would not be entitled to relief under any state of facts which could be proved in support of their claim under the ADA. Cook & Nichol, Inc. v. Plimsoll Club, 451 F.2d at 506. Similarly, *1292 Plaintiffs have alleged that Defendants have violated the Rehabilitation Act by excluding them from participating in and denying them the benefits of a program or activity. In light of the factual allegations in the complaint, Plaintiffs may be able to prove that visually and manually impaired voters are being denied meaningful access to the service, program, or activity. And so, the Court cannot say with certainty that the Plaintiffs would not be entitled to relief under any state of facts which could be proved in support of their claim under the Rehabilitation Act.
Plaintiffs may also be able to prove facts supporting a claim under the ADA pursuant to 28 C.F.R. § 35.160, of Subpart E ("Communications") of 28 C.F.R. Pt 35. Section 35.160 provides:
(a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.
(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.
(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.
"The public entity shall honor the [disabled person's] choice unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. Pt. 35 App. A.
In the instant case, Plaintiffs have alleged that Defendants have failed to furnish appropriate auxiliary aids. The Court cannot say that there is no set of facts which, if proved, would support their claim that Defendants violated 28 C.F.R. § 35.160.[19]
On a more general note, Defendants appear to characterize the Plaintiffs' Complaint as purporting to assert their ADA (Count One) and Rehabilitation Act (Count Three) claims on the basis of their exclusion from participation in or denial of the benefits of the services, program, or activities provided by the Defendants. That does, indeed, seem to be the emphasis of Plaintiffs' claims under the ADA and the Rehabilitation Act. However, as previously noted above, Title II of the ADA and Section 504 of the Rehabilitation Act proscribe more than such "exclusion" and "denial." They both, in addition, more generically proscribe disability "discrimination" by the pertinent public entities.[20] Without further parsing the allegations of Counts One and Three, suffice it to say that such counts appear to include allegations under the more generic proscription of the above statutes. Although this point has received very little treatment in the parties' submissions, the Court is of the view that such allegations may be significant. However, Counts One and Three, in their present form, are unclear insofar as Plaintiffs may seek to rely upon the more generic proscription of the above acts. Accordingly, *1293 since Plaintiffs will be afforded the opportunity of filing an amended complaint, as hereinafter provided, such amended complaint should allege more clearly in Counts One and Three the bases, if any, for their reliance upon the more generic proscription of the above acts (see footnote 20) in contradistinction to the acts' more specific proscriptions ("exclusion"/"denial").
Defendants also assert that Plaintiffs have failed to adequately plead that Defendants received federal financial assistance as required by Section 504 of the Rehabilitation Act. Section 504(a), quoted previously herein, applies to, inter alia, programs or activities receiving federal financial assistance. See 29 U.S.C. § 794(a). Section 504(b) provides:
"For the purposes of [Section 504 of the Rehabilitation Act], the term `program or activity' means all of the operations of 
(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government".
29 U.S.C. § 794(b). Section 794(b) was enacted as part of the Civil Rights Restoration Act of 1987, Pub.L. No. 100-259 (1988), to restore the "broad, institution wide application of the four civil rights statutes, including the Rehabilitation Act." Lussier v. Dugger, 904 F.2d 661, 665 (11th Cir.1990) (internal quotation marks omitted). "[T]he purpose of the [Civil Rights Restoration Act of 1987] was `to overturn the Supreme Court's 1984 decision in Grove City College v. Bell,'" 465 U.S. 555, 571, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), in which the Court narrowly defined the phrase "program or activity." Id. (quoting S.Rep. No. 64, 100th Cong., 2d Sess. 2, reprinted in 1988 U.S.Code Cong. & Ad. News 3, 3-4).[21]
Plaintiffs allege that "Defendants are an instrumentality of a local government that is a recipient of federal financial assistance." Since a program or activity includes all of the operations of an instrumentality of local government, the Rehabilitation Act is applicable if an instrumentality of local government receives federal financial assistance. Consequently, Plaintiff has adequately alleged that the "program or activity" at issue received federal financial assistance as to Defendants Stafford and the Council.[22]
*1294 Plaintiffs have not, however, alleged that Defendants Smith and Kast or their predecessors received federal financial assistance. Plaintiffs allege that Defendant Smith is the Florida Secretary of State and Defendant Kast is the Director for the Division of Elections within the Florida Department of State. Thus, Defendants Smith and Kast are not instrumentalities of local government. Since Plaintiffs made no other allegations regarding the receipt of federal financial assistance, Count Three is due to be dismissed with leave to amend as to Defendants Smith and Kast.

1. Recent Amendment of Florida Election Code, Creating Section 101.56062
Notwithstanding the above discussion, the Court notes that, although not brought to the Court's attention by the parties, the 2002 Florida Legislature has recently enacted new legislation concerning voting and voting systems. See 2002 Fla. Sess. Laws Serv. ch. 2002-281 (West). It is not clear whether this new legislation, Florida Laws 2002-281, which, inter alia, created Section 101.56062,[23] would satisfy or ameliorate the Plaintiffs' concerns which *1295 prompted the assertion of their ADA and Rehabilitation Act claims. Assuming that Plaintiffs have the right and desire to continue this litigation, it would seem that, particularly given the injunctive underpinnings of Plaintiffs' claims (essentially seeking affirmative mandatory relief as contrasted with a damages suit based on past acts), a substantial repleader or amended complaint, which would take into account the status of the Florida Election Code, post 2002 legislative session, would be in order.[24]

*1296 E. Legislative Immunity
Defendant Council members assert that they are entitled to absolute legislative immunity. The Council cites to Woods v. Gamel, 132 F.3d 1417, 1419 (11th Cir. 1998), and Ellis v. Coffee County Bd. of Registrars, 981 F.2d 1185, 1190 (11th Cir. 1993), for the proposition that local legislators are entitled to absolute legislative immunity for legislative acts. Defendant Council members argue that their vote to approve state funds for the purchase of the optical scan voting system was a legislative act entitling them to absolute immunity *1297 and requiring the action to be dismissed as to them.
The Speech or Debate Clause, Article I, Section 6, United States Constitution, immunizes members of Congress from suits for damages or prospective relief when acting within the sphere of legitimate legislative activity. See Supreme Court of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 731, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 502-03, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). The clause has been read broadly to ensure the independence of members of Congress, to reinforce the separation of powers, and to prevent suits from distracting or diverting "time, energy, and attention from legislative tasks." Eastland, 421 U.S. at 503, 95 S.Ct. 1813.
Similarly, "state legislators enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause." Supreme Court of Va., 446 U.S. at 732, 100 S.Ct. 1967. Such common-law immunity has also been extended to local legislators. See Woods, 132 F.3d at 1419. While the common-law legislative immunity available to state and local legislators is not always as broad as the immunity provided to members of Congress under the Speech or Debate Clause, in civil cases, the immunities appear to be of similar breadth. See U.S. v. Gillock, 445 U.S. 360, 372-73, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980) (holding that legislative privilege under the Speech or Debate Clause is broader in criminal actions than the common-law legislative privilege available to state and local legislators).
In the instant case, Plaintiffs' claims against Defendant Council members are premised on the Council members' voting to approve an ordinance appropriating funds for the purchase of voting equipment. Voting by such officials is manifestly a legislative act. See Woods, 132 F.3d at 1420. Consequently, the Defendant Council members are entitled to absolute legislative immunity.
Upon consideration thereof, it is hereby ORDERED:
1. With respect to the Motion to Dismiss (Dkt.5) filed by Defendants Smith and Kast, said Motion is GRANTED in part such that:
a. Count One and Count Three are DISMISSED with prejudice to the extent Plaintiffs assert that they have been excluded from or denied the benefits of a program of direct and secret voting that does not permit the type of assistance provided for in Section 101.051.

b. Count Two is DISMISSED with prejudice.
c. Count Three is DISMISSED with leave to amend. Plaintiffs may file an amended complaint as set forth in paragraph 3. below.
2. With respect to the Motion to Dismiss (Dkt.6) filed by Defendants Stafford, Alvarez, Brown, Carlucci, Carter, Chandler-Thompson, Daniels, Fullwood, Hipps, Holland, Holzendorf, Jenkins, Lockett-Felder, Overton, Ray, Rustin, Self, Soud, Southwell, and Yates, said Motion is GRANTED in part such that:
a. All Counts are DISMISSED with prejudice as to Defendants Alvarez, Brown, Carlucci, Carter, Chandler-Thompson, Daniels, Fullwood, Hipps, Holland, Holzendorf, Jenkins, Lockett-Felder, Overton, Ray, Rustin, Self, Soud, Southwell, and Yates.
b. Count One and Count Three are DISMISSED with prejudice as to Defendant Stafford to the extent Plaintiffs *1298 assert that they have been excluded from or denied the benefits of a program of direct and secret voting that does not permit the type of assistance provided for in Section 101.051.

c. Count Two is DISMISSED with prejudice.
3. Plaintiffs may file an amended complaint on or before November 5, 2002, that includes allegations supporting the Rehabilitation Act claim of Count Three as to Defendants Smith and Kast. In addition, such amended complaint should take into consideration current Florida law, as amended by the 2002 Florida Legislature. (See text of this Order accompanying footnote 23). Such amended complaint should also include appropriate clarifying allegations as stated in the paragraph immediately following footnote 19 of this Order.
NOTES
[1] Plaintiffs seek class certification. The motion therefor is pending.
[2] The facts stated in this section are necessarily as alleged by Plaintiffs. See infra, Section II. Motion to Dismiss Standard.
[3] When this suit was filed, Katherine Harris and L. Clayton Roberts held the offices, respectively, of Secretary of State of the State of Florida and Director of the Division of Elections within the Florida Department of State. They no longer occupy such offices and have been succeeded by Jim Smith and Edward C. Kast, respectively, the current occupants who, by this Court's August 21, 2002, Order, were substituted as party defendants in the place of Harris and Roberts pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure. Reference will be made, from time to time, in this Order to the "predecessors" of Jim Smith and Edward C. Kast. Such is intended to refer to Katherine Harris and L. Clayton Roberts.
[4] Fifth Circuit decisions handed down prior to the close of business on September 30, 1981 are binding precedent in the 11th Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).
[5] No Eleventh Amendment state sovereign immunity issue is involved in this case because the Eleventh Amendment is no bar to suits for injunctive relief against state officials. Ex parte Young, 209 U.S. 123, 159-160, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Reickenbacker v. Foster, 274 F.3d 974, 975 (5th Cir. 2001).
[6] The Court does not decide whether this case would be ripe for adjudication or whether Plaintiffs would have standing as to the claims against Defendants Smith and Kast if the Secretary of State and the Director of the Division of Elections only certify voting systems presented to them by counties.
[7] Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).
[8] E.g., Burford abstention under Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and Colorado River abstention under Colorado River Water Conservation District v. U.S., 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).
[9] Section 101.051 provides:

(1) Any elector applying to vote in any election who requires assistance to vote by reason of blindness, disability, or inability to read or write may request the assistance of two election officials or some other person of the elector's own choice, other than the elector's employer, an agent of the employer, or an officer or agent of his or her union, to assist the elector in casting his or her vote. Any such elector, before retiring to the voting booth, may have one of such persons read over to him or her, without suggestion or interference, the titles of the offices to be filled and the candidates therefor and the issues on the ballot. After the elector requests the aid of the two election officials or the person of the elector's choice, they shall retire to the voting booth for the purpose of casting the elector's vote according to the elector's choice.
(2) It is unlawful for any person to be in the voting booth with any elector except as provided in subsection (1).
(3) Any elector applying to cast an absentee ballot in the office of the supervisor, in any election, who requires assistance to vote by reason of blindness, disability, or inability to read or write may request the assistance of some person of his or her own choice, other than the elector's employer, an agent of the employer, or an officer or agent of his or her union, in casting his or her absentee ballot.
(4) If an elector needs assistance in voting pursuant to the provisions of this section, the clerk or one of the inspectors shall require the elector requesting assistance in voting to take the following oath:
DECLARATION TO SECURE ASSISTANCE
State of Florida
County of ____
Date ____
Precinct ____
I, (Print name), swear or affirm that I am a registered elector and request assistance from (Print names) in voting at the (name of election) held on (date of election) for the following reason
(Signature of voter)
Sworn and subscribed to before me this ____ day of ____, (year).
(Signature of Official Administering Oath)
(5) The supervisor of elections shall deliver a sufficient number of these forms to each precinct, along with other election paraphernalia.
[10] This previous version of Section 101.051 provided:

(1) Any elector applying to vote in any election who is unable to read or write or who, because of some physical disability, needs assistance in voting may request assistance of two election officials or some other person of his own choice, who has not previously so acted for more than one other person during the election, to assist him in casting his vote. Any such elector, before retiring to the voting booth, may have one of the election officials read over to him, without suggestion or interference, the titles of the offices to be filled and the candidates therefor and the issues on the ballot. After the elector requests the aid of the two election officials, or the person of his choice, they shall retire to the voting booth for the purpose of casting the elector's vote according to the elector's choice.
(2) It shall be unlawful for any person to be in the voting booth with any elector except as provided in subsection (1).
(3) Any elector applying to cast an absentee ballot in the office of the supervisor, in any election, who is unable to read or write or who, because of some physical disability, needs assistance in voting may request the assistance of some person of his own choice, who has not previously assisted more than one other person during the election, in casting his absentee ballot. However, no supervisor of elections or his deputies or members of his staff shall act in such capacity.
(4) If an elector needs assistance in voting pursuant to the provisions of this section, the clerk or one of the inspectors shall require the elector requesting assistance in voting to take the following oath:
DECLARATION TO SECURE ASSISTANCE
State of Florida
County of ....
Date .....
Precinct .....
I, ..... (Print name) ....., swear or affirm that I am a registered elector and request assistance from .... (Print names) ..... in voting at the ..... (name of election) ..... held on ..... (date of election) ..... for the following reason ......
..... (Signature of voter) .....
Sworn and subscribed to before me this ..... day of ....., 19.....
..... (Signature of Official Administering Oath) .....
(5) The supervisor of elections shall deliver a sufficient number of these forms to each precinct, along with other election paraphernalia.
Fla. Stat. § 101.051 (1967).
[11] See Section D.1., infra, (particularly at footnotes 23 and 24), for discussion of recent legislation enacted by the 2002 Florida Legislature.
[12] Section 101.5606 provides:

No electronic or electromechanical voting system shall be approved by the Department of State unless it is so constructed that:
(1) It permits and requires voting in secrecy.
(2) It permits each elector to vote at any election for all persons and offices for whom and for which the elector is lawfully entitled to vote, and no others; to vote for as many persons for an office as the elector is entitled to vote for; and to vote for or against any question upon which the elector is entitled to vote.
(3) The automatic tabulating equipment will be set to reject all votes for any office or measure when the number of votes therefor exceeds the number which the voter is entitled to cast or when the voter is not entitled to cast a vote for the office or measure.
(4) It is capable of correctly counting votes.
(5) It permits each voter at a primary election to vote only for the candidates seeking nomination by the political party in which such voter is registered, for any candidate for nonpartisan office, and for any question upon which the voter is entitled to vote.
(6) At presidential elections it permits each elector, by one operation, to vote for all presidential electors of a party or for all presidential electors of candidates for President and Vice President with no party affiliation.
(7) It provides a method for write-in voting.
(8) It is capable of accumulating a count of the specific number of ballots tallied for a precinct, accumulating total votes by candidate for each office, and accumulating total votes for and against each question and issue of the ballots tallied for a precinct.
(9) It is capable of tallying votes from ballots of different political parties from the same precinct, in the case of a primary election.
(10) It is capable of automatically producing precinct totals in printed, marked, or punched form, or a combination thereof.
(11) If it is of a type which registers votes electronically, it will permit each voter to change his or her vote for any candidate or upon any question appearing on the official ballot up to the time that the voter takes the final step to register his or her vote and to have the vote computed.
(12) It is capable of providing records from which the operation of the voting system may be audited.
[13] Section 101.28 provides:

All voting machines purchased for use in this state shall meet the following minimum requirements:
(1) Each voting machine shall:
(a) Secure to the elector secrecy in the act of voting.
(b) Provide facilities for voting for or against as many questions as may be submitted.
(c) Permit the elector to vote for the candidates of one or more parties.
(d) Permit the elector to vote for as many persons for an office as the elector is lawfully entitled to vote for, but no more.
(e) Prevent the elector from voting for the same person more than once for the same office.
(f) Permit the elector to vote for or against any question the elector may have the right to vote upon, but no other.
(g) Be so equipped that, when used in primary elections, the election officials can, by a single adjustment on the outside of the machine, lock out all races and questions except those in which the elector is entitled to vote.
(h) Correctly register or record, and accurately count, all votes cast for any and all persons and for or against any and all questions.
(i) Be provided with a "protective counter" or "protective device" whereby any operation of the machine before or after the election will be detected.
(j) Be provided with a counter which shall show at all times during any election how many persons have voted.
(k) Be provided with one device per machine for each party for voting for all presidential electors of that party by one operation (in connection with which there shall be provided on the ballot the words "Electors for President and Vice President" followed by the name of the party and thereafter by the names of the candidates thereof for the offices of President and Vice President) and a registering device which shall register the votes cast for such electors thus voted for collectively, as contemplated by s. 103.011.
(2) Each voting machine shall be furnished with an electric light, or a proper substitute for one, which will give sufficient light to enable electors while voting to read the ballots.
(3) Each voting machine used in any election shall be provided with a screen, hood, or curtain which shall be so made and adjusted as to conceal the elector and the elector's action while voting.
(4) Voting machines may be provided with a device or devices which will print a copy or copies of the count shown on the candidate and question counters, as registered both before the polls open and after the polls close.
[14] See McCray v. City of Dothan, 169 F.Supp.2d 1260, 1273 (M.D.Ala.2001); Harris v. Thigpen, 941 F.2d 1495 (11th Cir.1991); Allison v. Dept. of Corrections, 94 F.3d 494, 497 (8th Cir.1996); Van Zande v. Wisconsin Dep't. of Admin., 44 F.3d 538, 542 (7th Cir. 1995).
[15] Title II is to be read in conjunction with the regulations promulgated by the Department of Justice pursuant to 42 U.S.C. § 12134 of the ADA. Ellen S. v. Florida Board of Bar Examiners, 859 F.Supp. 1489 (S.D.Fla.1994); see also Alexander v. Sandoval, 531 U.S. 1049, 121 S.Ct. 652, 148 L.Ed.2d 556 (2000).
[16] Since, as noted above, "facilities" are defined to include "equipment," the regulation's reference to construction of facilities (e.g., "facilities constructed or altered after" a certain date) apparently is intended to apply to alterations of equipment, such as voting machines.
[17] Section 35.150(a) provides:

(a) General. A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not ....
(subsections (a)(1)-(3) not included here).
[18] Although accessibility to the facility in Shotz was considered under the more lenient standard of 28 C.F.R. § 35.150(a), see footnote 17, supra, because it was not altered or constructed after January 26, 1992, the case is instructive on the meaning of the phrase "readily accessible."
[19] It is not clear whether Plaintiffs are alleging that Defendants subjected Plaintiffs to discrimination pursuant to 28 C.F.R. § 35.130(b) and 28 C.F.R. § 42.503(b). Since Defendants did not specifically move to dismiss these potential claims, the Court will not address them in this Order.
[20] For example, the concluding phrase in Title II of the ADA is: "... or be subjected to discrimination by any such entity."
[21] In Grove City College, the Court, in considering the Title IX prerequisite that an educational program or activity receive federal financial assistance, stated that federally funded student loans, grants, scholarships, etc. received by students constituted federal financial assistance. See id. at 563, 569, 104 S.Ct. 1211. However, the Court held that the whole institution did not receive federal financial assistance; rather, only the student financial aid program received such assistance. See id. at 571, 104 S.Ct. 1211.
[22] Defendants Stafford and the Council assert that Nelson v. Miller, 170 F.3d 641, 653 n. 8 (6th Cir.1999), and Lightbourn v. County of El Paso, Texas, 118 F.3d 421, 427 (5th Cir.1997), support their argument that Plaintiffs have failed to adequately allege that they received federal financial assistance. In Nelson, the plaintiff alleged that the "`Defendant is an official of the state of Michigan which receives federal financial assistance.'" Id. (quoting the complaint therein). The court stated that, by using the phrase "which receives federal financial assistance" instead of "who receives federal financial assistance," the plaintiff alleged that the state and not the defendant received federal financial assistance. Id. Since a state is not within the definition of a "program or activity" set forth in Section 794(b), the court held that the plaintiff failed to allege that the defendant received federal financial assistance. Id.

Similarly, in Lightbourn the court considered whether the receipt of federal funds by the State of Texas was sufficient to bring the Texas Secretary of State within the purview of Section 794. Lightbourn, 118 F.3d at 426. The court ruled "that to state a § 504 claim against a state actor a plaintiff must allege that the specific program or activity with which he or she was involved receives or directly benefits from federal financial assistance." Id. at 427. The court reasoned, after citing to the definition of a "program or activity" in Section 794(b), that a § 794 claim cannot be predicated on the fact that a state receives federal financial assistance. See id. at 426-27.
In the instant case, however, Plaintiffs allege that Defendants are an instrumentality of a local government that received federal financial assistance. As discussed above, in light of the definition of a "program or activity" set forth in Section 794(b), Plaintiff has adequately alleged that Defendants Stafford and the Council received federal financial assistance.
[23] Section 101.56062 provides:

(1) Notwithstanding anything in this chapter to the contrary, each voting system certified by the Department of State for use in local, state, and federal elections must include the capability to install accessible voter interface devices in the system configuration which will allow the system to meet the following minimum standards:
(a) The voting system must provide a tactile input or audio input device, or both.
(b) The voting system must provide a method by which voters can confirm any tactile or audio input by having the capability of audio output using synthetic or recorded human speech that is reasonably phonetically accurate.
(c) Any operable controls on the input device which are needed for voters who are visually impaired must be discernable tactilely without actuating the keys.
(d) Audio and visual access approaches must be able to work both separately and simultaneously.
(e) If a nonaudio access approach is provided, the system may not require color perception. The system must use black text or graphics, or both, on white background or white text or graphics, or both, on black background, unless the office of the Secretary of State approves other high-contrast color combinations that do not require color perception.
(f) Any voting system that requires any visual perception must offer the election official who programs the system, prior to its being sent to the polling place, the capability to set the font size, as it appears to the voter, from a minimum of 14 points to a maximum of 24 points.
(g) The voting system must provide audio information, including any audio output using synthetic or recorded human speech or any auditory feedback tones that are important for the use of the audio approach, through at least one mode, by handset or headset, in enhanced auditory fashion (increased amplification), and must provide incremental volume control with output amplification up to a level of at least 97 dB SPL.
(h) For transmitted voice signals to the voter, the voting system must provide a gain adjustable up to a minimum of 20 dB with at least one intermediate step of 12 dB of gain.
(i) For the safety of others, if the voting system has the possibility of exceeding 120 dB SPL, then a mechanism must be included to reset the volume automatically to the voting system's default volume level after every use, for example when the handset is replaced, but not before. Also, universal precautions in the use and sharing of headsets should be followed.
(j) If sound cues and audible information such as "beeps" are used, there must be simultaneous corresponding visual cues and information.
(k) Controls and operable mechanisms must be operable with one hand, including operability with a closed fist, and operable without tight grasping, pinching, or twisting of the wrist.
(l) The force required to operate or activate the controls must be no greater than 5 pounds of force.
(m) Voting booths must have voting controls at a minimum height of 36 inches above the finished floor with a minimum knee clearance of 27 inches high, 30 inches wide, and 19 inches deep, or the accessible voter interface devices must be designed so as to allow their use on top of a table to meet these requirements. Tabletop installations must include adequate privacy.
(n) Any audio ballot must provide the voter with the following functionalities:
1. After the initial instructions that the system requires election officials to provide to each voter, the voter should be able to independently operate the voter interface through the final step of casting a ballot without assistance.
2. The voter must be able to determine the races that he or she is allowed to vote in and to determine which candidates are available in each race.
3. The voter must be able to determine how many candidates may be selected in each race.
4. The voter must be able to have confidence that the physical or vocal inputs given to the system have selected the candidates that he or she intended to select.
5. The voter must be able to review the candidate selections that he or she has made.
6. Prior to the act of casting the ballot, the voter must be able to change any selections previously made and confirm a new selection.
7. The system must communicate to the voter the fact that the voter has failed to vote in a race or has failed to vote the number of allowable candidates in any race and require the voter to confirm his or her intent to undervote before casting the ballot.
8. The system must prevent the voter from overvoting any race.
9. The voter must be able to input a candidate's name in each race that allows a write-in candidate.
10. The voter must be able to review his or her write-in input to the interface, edit that input, and confirm that the edits meet the voter's intent.
11. There must be a clear, identifiable action that the voter takes to "cast" the ballot. The system must make clear to the voter how to take this action so that the voter has minimal risk of taking the action accidentally but, when the voter intends to cast the ballot, the action can be easily performed.
12. Once the ballot is cast, the system must confirm to the voter that the action has occurred and that the voter's process of voting is complete.
13. Once the ballot is cast, the system must preclude the voter from modifying the ballot cast or voting or casting another ballot.
(2) Such voting system must include at least one accessible voter interface device installed in each precinct which meets the requirements of this section, except for paragraph (1)(d).
(3) The Department of State may adopt rules in accordance with s. 120.54 which are necessary to administer this section.
2002 Fla. Sess. Laws Serv. ch. 2002-281 (West) ( notations reflecting added and removed language omitted).
[24] The Court notes that the new Florida legislation would not affect the Court's ruling as to Count Two (the Florida constitutional claim). Assuming that the standards for the interface devices set forth in Section 101.56062 will allow visually and manually impaired voters to vote without assistance, Section 101.56062 does not alter the presumption (previously referred to herein) that the Legislature has interpreted the "direct and secret" language as being satisfied by the assistance provided by Section 101.051. "A Constitution is not to be made to mean one thing at one time and another at some subsequent time, when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable." State ex rel. West v. Butler, 70 Fla. 102, 69 So. 771, 780 (1915) (holding that Florida Constitutional provision did not allow for more than one circuit court judge per judicial circuit; reasoning in part that a legislative construction of the constitutional provision passed contemporaneously with the adoption of the constitutional provision supported this interpretation and that the constitution should not later be interpreted to have a different meaning even if such new meaning was desirable at the time).

Where a particular construction has been generally accepted and acted upon, and especially when this has occurred contemporaneously with the adoption of the Constitution, and by those who had opportunity to understand the intention of the instrument, a strong presumption exists that the construction rightly interprets the intention.
Id.
For over thirty years, the Florida Legislature has at least tacitly interpreted the "direct and secret" requirement of the Florida Constitution as being satisfied by the assistance provided in Section 101.051. As noted above, at the time the language at issue was added to the Constitution, a previous version of Section 101.051 provided assistance to disabled voters. In addition, legislative enactments more contemporaneous with the adoption of the "direct and secret" language than Section 101.56062 provided assistance to disabled voters without also providing a method for disabled voters to vote without assistance. Consequently, the interpretation of Article VI, Section 1 indicated by these previous, more contemporaneous legislative enactments are presumed to be correct, and Section 101.56062 cannot reasonably be interpreted as changing the meaning of Article VI, Section 1.
This holding is supported by the absence of any reference in the staff analysis for Senate Bill 1350, which was enacted as Florida Laws 2002-281, to Article VI, Section 1 or to the requirement that elections be by "direct and secret" vote. See Senate Staff Analysis and Economic Impact Statement, S.B. 1350, 2002 Leg., Reg. Sess. (Fla.2002).
It appears that Section 101.56062 simply provides broader rights than those required by Article VI, Section 1. Such is certainly permissible as long, of course, as the legislation is not in contravention of the Florida or federal constitutions. See Pinellas County v. Laumer, 94 So.2d 837, 840 (Fla.1957) (holding that the authority of the Legislature is limited only by the Constitution); State ex rel. Johnson v. Johns, 92 Fla. 187, 109 So. 228, 231 (1926) (holding that legislative authority is only limited by the state and federal constitutions). This interpretation is supported by the fact that the Legislature has not required that all voting systems used meet the standards provided in Section 101.56062. Instead, the standards are reserved to voting systems approved by the Department of State. This necessarily is limited to voting systems certified after this section was enacted. If the Legislature had interpreted Article VI Section 1 as providing a right to unassisted voting, then the Legislature likely would have taken action to more fully provide for this right. If, however, the Legislature is merely providing a broader right by statute than is required by the Constitution, then only requiring newly certified voting systems to meet the requirements of Section 101.56062 would not be an inappropriate way to provide for this right.