94 F.3d 808
 5 A.D. Cases 1499, 8 NDLR P 342
 Edward MOLLOY, The Long Island Center for Independent
Living, Inc., The Helen Keller National Center for
Deaf-Blind Youths and Adults, The American Council of the
Blind of New York, Inc., Long Island Chapter, and Irene
Ciorra, Plaintiffs-Appellees,
v.
METROPOLITAN TRANSPORTATION AUTHORITY and Long Island
Railroad, Defendants-Appellants.
 No. 2499, Docket 96-7786.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 5, 1996.
Decided Sept. 5, 1996.
 
 Richard J. Holwell, New York City (Glenn M. Kurtz, White & Case, New York City, Roger J. Schiera, LIRR Law Dept., Jamaica, NY, Robert L. Folks, Joel M. Markowitz, Cahn Wishod & Lamb, LLP, Melville, NY, of counsel), for Defendants-Appellants.
 Dolores Fredrich, Uniondale, NY (F. Judith Helpworth, Dina Talmor Miller, Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano, P.C., of counsel), for Plaintiffs-Appellees.
 Charles G. Moerdler, Brian M. Cogan, Charles E. Torres, Stroock & Stroock & Lavan, New York City, of counsel, for Amicus Curiae Senator Alfonse M. D'Amato.
 Before: CALABRESI and PARKER, Circuit Judges, POLLAK, District Judge.*
 PARKER, Circuit Judge:
 
 
 1
 Plaintiffs, a group of individuals and organizations representing the interests of the blind and visually impaired, sought and received an order of the United States District Court for the Eastern District of New York (Leonard D. Wexler, Judge ) preliminarily enjoining defendants, the Metropolitan Transit Authority ("MTA") and its subsidiary the Long Island Railroad ("LIRR"), from implementing a staff reduction plan in thirty-two LIRR stations. The staff reduction plan, which was implemented to address an annual operating budget deficit of over $30 million, involved removing human ticket clerks from thirty-two low volume LIRR stations. The plan also called for the installation of station doors that will lock and unlock automatically depending on the time of day. The plan also called for the installation of ticket vending machines ("TVMs") in eighteen of the thirty two stations in which TVMs had not already been installed.
 
 
 2
 Plaintiffs contend that the staff reduction plan violates the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (1994) ("ADA"). That statute makes it unlawful:
 
 
 3
 with respect to alterations of an existing station or part thereof in ... commuter rail transportation systems that affect or could affect the usability of the station or part thereof, for the ... person in control of the station to fail to make the alterations in such a manner that, to the maximum extent feasible, the altered portions of the station are readily accessible to and usable by individuals with disabilities....
 
 
 4
 42 U.S.C. § 12162(e)(2)(B)(i).
 
 
 5
 The district court issued the preliminary injunction from the bench on May 30, 1996. In its ruling, the district court concluded that plaintiffs showed that they would suffer irreparable harm if the injunction did not issue and that the balance of hardships tipped decidedly in their favor. The district court also concluded that there was a substantial question regarding whether closing ticket offices, removing ticket clerks and replacing them with TVMs are "alterations," such that those aspects of the ticket reduction plan must be executed "in such a manner that, to the maximum extent feasible," the affected stations remained usable by plaintiffs.
 
 
 6
 The next day defendants moved to reargue the propriety of the injunction, arguing that the district court had employed the wrong standard in deciding to issue the preliminary injunction. Defendants based this argument on New York Urban League, Inc. v. State of New York, 71 F.3d 1031, 1036 n. 7 (2d Cir.1995), in which we noted that the only proper standard for issuing a preliminary injunction which blocked a New York City subway fare increase was (1) a showing of irreparable injury in the absence of the injunction, and (2) the establishment of likelihood of success on the merits.
 
 
 7
 In Urban League, we held that only the likelihood of success standard was proper because the injunction blocked a "fare increase that was to be implemented in accordance with the special powers of the [New York Transit Authority] as set forth in N.Y.Pub.Auth.Law § 1205(1) (McKinney 1982)." Defendants argued to the district court that the LIRR is similarly authorized pursuant to N.Y.Pub.Auth.L. § 1266 to implement its staffing reduction plan. Therefore, defendants argued, plaintiffs should be required to show the district court a likelihood of success on the merits.
 
 
 8
 In response, Judge Wexler granted the motion to reargue the injunction, and reaffirmed the injunction's issuance by holding that plaintiffs also had established a likelihood of success on the merits. The district court has thus ruled that both sets of criteria that must be satisfied for a preliminary injunction to issue have been satisfied.
 
 
 9
 The injunction prohibits the LIRR from implementing its staff reduction "plan as to any of the 32 affected stations," directed the LIRR to reopen seven stations to which the plan had previously been applied, and directed the LIRR to "maintain Long Island Railroad personnel on the platforms" at seven other stations that had previously been affected by the staff reduction plan.
 
 
 10
 Defendants took this appeal pursuant to 28 U.S.C. § 1292(a)(1).
 
 
 11
 As explained below, we hold that under the circumstances of this case, plaintiffs were required to show a likelihood of success on the merits and irreparable injury in the absence of the injunction. We also hold that the district court abused its discretion when it concluded that plaintiffs were likely to succeed in establishing that the removal of ticket clerks from stations constitutes an "alteration" under the ADA, and that the plaintiffs would be irreparably harmed by the installation of TVMs. Accordingly, we vacate the injunction.
 
 
 12
 I. The Standards for Issuing and Reviewing the Issuance of a Preliminary Injunction.
 
 
 13
 There are generally two standards for issuing a preliminary injunction.
 
 
 14
 The party seeking the injunction must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.
 
 
 15
 Able v. United States, 44 F.3d 128, 130 (2d Cir.1995) (per curiam). However, only the "likelihood of success" standard applies when the injunction seeks to prevent government action taken pursuant to statutory authority, which is presumed to be in the public interest. Id. at 131. We have held that certain conduct by New York's public transportation authorities constitutes such governmental action. See Urban League, 71 F.3d at 1036 n. 7.
 
 
 16
 Here, the MTA's authorizing statute, N.Y.Pub.Auth.Law §§ 1260-1278 (McKinney 1982), specifically authorizes the MTA to collect fares and operate its facilities as the MTA deems convenient. N.Y.Pub.Auth.Law § 1266(2),(3). Consistent with Urban League, we hold that only the likelihood of success standard properly applies here.
 
 
 17
 We review this issuance of a preliminary injunction for an abuse of discretion. Reuters, Ltd. v. United Press International, Inc., 903 F.2d 904 (2d Cir.1990). Such an abuse occurs when the district court makes an error of law or fact. Id.
 
 
 18
 II. Whether Staff Reductions Constitute an "Alteration" under the ADA.
 
 
 19
 The statute at issue here, 42 U.S.C. § 12162(e)(2)(B)(i), only applies to "alterations of an existing station or part thereof." The statute's text thus supports defendants' argument, suggesting that only changes to the station are regulated by the statute.
 
 
 20
 This interpretation is further supported by the regulations promulgated by the Secretary of Transportation pursuant to 42 U.S.C. § 12164. Those regulations include a definition of "alteration":
 
 
 21
 Alteration means a change to an existing facility, including, but not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical or electrical systems are not alterations unless they affect the usability of the building facility.
 
 
 22
 49 C.F.R. § 37.3. Literally, an "alteration" is "change" to a "facility." By way of non-exclusive example, the regulation lists only physical modifications of a relatively permanent nature to the facility. Under the common sense approach to interpreting a general provision in the light of a list of specific illustrative provisions, ejusdem generis, we construe the general term (here, "change") to include only things similar to the specific items in the list.
 
 
 23
 Plaintiffs emphasize that the presence or absence of a ticket clerk significantly affects the extent to which a station is usable to a blind or visually impaired person. Aside from selling tickets,[1] ticket clerks provide information relating to train schedules and train station configuration. Furthermore, the presence of a LIRR employee gives blind and visually disabled persons a significantly greater degree of security.
 
 
 24
 Notwithstanding these important services which ticket clerks provide, and notwithstanding the remedial nature of the ADA, we think it would be a strained reading of the statute and the regulation interpreting it to hold that the term "alteration" encompasses the removal of ticket clerks. The presence of a ticket clerk at these stations is not a twenty-four hour event. Indeed, at oral argument we were informed that ticket clerks generally work from 7 a.m. to 1 p.m. Plaintiffs' argument suggests that every day at one o'clock, the station is altered in contravention of the statute. Ticket agents, passengers, and trains, come and go. When they leave the station, the station is different in a significant sense. But the station is not altered so as to trigger the demands of the ADA.
 
 
 25
 Defendants ask a rhetorical question to illustrate the limits of plaintiffs' argument. If a reduction or reallocation of staff implicates the ADA, then how would a city be able to remove a traffic policeman from a busy intersection without violating that statute? Neither plaintiffs, nor we, have an answer. For these reasons, we conclude that the plaintiffs are not likely to succeed in their claim that the staff reductions constitute an "alteration" under the ADA.
 
 
 26
 III. The Propriety of Enjoining the installation of TVMs.
 
 
 27
 A. Whether plaintiffs are likely to establish that the installation of TVMs is an "alteration" under the ADA.
 
 
 28
 We note our agreement with Judge Wexler that plaintiffs are likely to establish that the installation of TVMs are an "alteration." The installation of a TVM constitutes a physical modification to the station. It also requires additional wiring and communication lines which feed into the LIRR's central TVM monitoring facility. The above-quoted statutory and regulatory language suggests that such modifications are indeed encompassed by the statute.
 
 
 29
 Defendants suggest that the installation of a TVM is akin to the installation of a bench. Because either can be removed, neither should be considered an "alteration." It is easy to imagine, however, how the installation of a bench in a station could block an otherwise wheelchair-accessible path, or otherwise render a station less usable to the disabled. We cannot say that Judge Wexler abused his discretion in concluding that plaintiffs were likely to succeed in establishing that the installation of TVMs is in fact an "alteration." Accordingly, that part of the station that is modified by the installation of the TVMs must conform to the requirements of § 12162(e)(2)(B)(i). We also cannot say Judge Wexler abused his discretion in concluding that plaintiffs were likely to succeed in showing that the TVMs fail to so conform. There is testimony in the record from the disabled that suggests the machines are not usable by the blind or visually impaired. The TVMs require the user to select from and respond to numerous visual prompts. While some machines use braille and raised lettering, the machines lack audio prompts to allow the visually impaired user to confirm the accuracy of the ticket purchase. Whether the machines are in fact usable by the disabled "to the maximum extent feasible" will require further factual development below.
 
 
 30
 B. Whether plaintiffs are irreparably harmed if the installation of TVMs is not enjoined.
 
 
 31
 We hold that the district court abused its discretion in holding that plaintiffs would be irreparably harmed if the injunction against the installation of the TVMs did not issue. The only service that the TVMs provide is the sale of tickets. The blind and visually impaired can still purchase tickets on board, without paying the ticket surcharge which the non-disabled must pay. It is true that one cannot buy a weekly or monthly ticket from the conductor on board, and those tickets are more economical than the single trip tickets. But monthly tickets are purchasable via the mail and weekly and monthly tickets can be bought at any destination station where there is a ticket clerk. We do not doubt that these alternatives are less convenient than purchasing a weekly or monthly ticket from a TVM or from a human ticket clerk. However, we cannot say that the extra inconvenience rises to the level of irreparable harm such that the LIRR must be stopped from implementing its plan. See Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir.1995) (noting injuries such as expenditures of money, time, and energy, are not enough to warrant preliminary injunction).
 
 
 32
 The harm plaintiffs complain of relating to TVMs is a diminished ability to use the station, not an inability to purchase a ticket. But that harm relates to the staffing reductions, not the installation of TVMs. In fourteen of the thirty-two affected stations, TVMs were installed prior to the staff reduction plan. Plaintiffs have heretofore had no problems with the installation of TVMs so long as ticket clerks continue to be present at the stations.
 
 
 33
 IV. Conclusion.
 
 
 34
 Accordingly, despite the existence of substantial questions going to the merits, and the fact that the installation of TVMs are likely to constitute an alteration, the injunction is vacated.
 
 
 
 *
 The Honorable Louis H. Pollak, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 If the blind and visually impaired are unable to use the TVMs, they may purchase tickets on board the train without the surcharge that typically accompanies an on board purchase