[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15004

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2011
JOHN LEY
CLERK

D. C. Docket No. 01-01275-CV-J-25-HTS

AMERICAN ASSOCIATION OF PEOPLE
WITH DISABILITIES,
on behalf of themselves and others
similarly situated,
DANIEL W. O'CONNOR,
KENT BELL,
on behalf of themselves and others similarly
situated,
BETH BOWEN,
on behalf of herself and others similarly
situated,

Plaintiffs-Appellees,

versus

KATHERINE HARRIS,
as Secretary of State for the State
of Florida, et al.,

Defendants,

JERRY HOLLAND,
as Supervisor of Elections in
Duval County, Florida,

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(July 27, 2011)

**ON PETITION FOR REHEARING**

Before TJOFLAT and CARNES, Circuit Judges, and HOOD,[*] District Judge.

TJOFLAT, Circuit Judge:

Upon consideration of the Plaintiff-Appellees' petition for panel rehearing, we vacate our prior opinion in this case, issued on May 11, 2010, and published at 605 F.3d 1124 (11th Cir. 2010), and substitute the following opinion in its place. In this revised opinion, we adhere to our prior conclusion that the district court erroneously granted the Plaintiffs' requested declaratory judgment and injunction against purported violations of the Americans with Disabilities Act of 1990 (the "ADA"), Pub. L. No. 101-336, 104 Stat. 327 (1990) (codified as amended at 42 U.S.C. §§ 12101–12213), and the regulations promulgated thereunder. This

_____

[*] Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

2

opinion, however, bases that outcome exclusively on the ground that voting

machines are not "facilities" under 28 C.F.R. § 35.151(b).

I.

The Plaintiffs are visually or manually impaired Florida citizens who are

registered to vote in Duval County, Florida and are represented by the American

Association of People with Disabilities (collectively, the "Plaintiffs"). The

Plaintiffs filed a putative class action on November 8, 2001,[1] against Katherine

Harris, Florida Secretary of State; L. Clayton Roberts, Director of the Division of

Elections of the Florida Department of State; John Stafford, the Supervisor of

Elections of Duval County; and members of the Jacksonville City Council

(collectively, the "Defendants").[2] The Plaintiffs allege that the Defendants violated

---

[1] The case was filed in the Jacksonville Division of the U.S. District Court for the Middle District of Florida and assigned to the Honorable Ralph W. Nimmons, Jr. Judge Nimmons handled the case until shortly before his death on November 24, 2003. The case was then reassigned to the Honorable Wayne E. Alley of the Western District of Oklahoma, who handled it until September 2, 2004. On September 14, 2004, the case was reassigned to the Honorable Henry L. Adams, Jr., and he has presided over the case since that date.

[2] The geographic limits of the City of Jacksonville and Duval County are coextensive. The City and the County are consolidated and are governed under the Charter of the Consolidated Government of the City of Jacksonville, which established a mayor-city council form of government. Throughout this opinion, we refer to the City and the County interchangeably.

Jerry Holland succeeded John Stafford as Supervisor of Elections in Duval County, and Glenda E. Hood and Edward C. Kast succeeded Katherine Harris and L. Clayton Roberts, respectively. The district court dismissed the City Council members and the state officials from the case in orders entered on October 16, 2002, and September 20, 2007, respectively. Those dismissals are not challenged here. Although Jerry Holland is the sole defendant remaining in the case, for brevity we refer to him and the others who were sued collectively as the "Defendants."

3

federal statutory and state constitutional provisions by failing to provide handicapped-accessible voting machines to visually or manually impaired Florida voters after the 2000 general election. Specifically, Duval County purchased voting machines that used optical scan technology[3] to avoid "hanging chads" and other problems associated with the punch card system used in 2000.[4] These optical scanning machines did not enable the Plaintiffs to vote without the assistance of third parties; this assistance required the Plaintiffs to disclose their votes to these third parties. Duval County also purchased voting machines utilizing touch screens and audio enhancements, which enabled the Plaintiffs to vote unassisted, but the County only purchased three such machines for the entire County's use.

The Plaintiffs alleged that due to the lack of handicapped-accessible voting equipment, they could not—unlike non-disabled citizens—cast a "direct and secret ballot." Compl. ¶¶ 57, 73–74. According to the complaint, this impairment violated the ADA in three ways. First, purchasing the optical scanners violated 42

---

[3] An optical scan system provides voters with a paper ballot that features ovals next to each candidate's name or ballot issue. The voter uses a pen to fill in the oval corresponding to his or her vote. Election officials then feed the ballot through a machine that uses a light beam to record which oval the voter selected and tabulates the total number of votes.

[4] After the 2000 general election, Florida enacted legislation prohibiting the use of punch card systems effective September 2, 2002. Fla. Stat. § 101.56042.

U.S.C. § 12132[5] because these machines prevented the Plaintiffs from participating in a public program—voting—in the same manner as non-disabled citizens. Florida law requires that voting machines must enable voters to cast a "direct and secret vote." Fla. Const. art. VI, § 1. The Plaintiffs contended that, because they were required to disclose their votes to third parties and had to rely on third parties to mark accurately their votes, their votes were neither secret nor direct; they therefore had been excluded from Florida's program of "direct and secret" voting. Second, the Plaintiffs alleged that the new voting machines were an altered "facility" and therefore had to be readily accessible to and usable by people with disabilities "to the maximum extent feasible," as required by 28 C.F.R. § 35.151(b),[6] a regulation implementing 42 U.S.C. § 12132. Third, the Plaintiffs claimed that the non-accessible voting machines did not enable them to

---

[5] 42 U.S.C. § 12132 provides

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

[6] 28 C.F.R. § 35.151(b)(1) provides, in relevant part:

Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.

5

communicate their votes as effectively as non-disabled voters, in violation of 42

U.S.C. § 12132 and the implementing regulation 28 C.F.R. § 35.160(a)–(b).[7]

The complaint also stated claims under the Rehabilitation Act of 1973, Pub.

L. No. 93-112, 87 Stat. 368 (1973) (as amended, the "Rehabilitation Act"), 29

U.S.C. § 794, and provisions of the Florida Constitution and statutes.[8]  The

Plaintiffs requested a declaration that the Defendants' conduct violated those laws,

as well as an injunction prohibiting the Defendants from continuing their allegedly

illegal activities and from purchasing more inaccessible voting machines.

---

[7]  28 C.F.R. § 35.160(a)–(b)'s relevant provisions provide:

(a) (1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.
. . . .
(b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.
(2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.  In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

[8]  The complaint invoked the district court's federal question jurisdiction, 28 U.S.C. § 1331, with respect to the ADA and Rehabilitation Act claims, and the court's supplemental jurisdiction, 28 U.S.C. § 1367, with respect to the state law claims.

6

The Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that they had no duties under the ADA, the Rehabilitation Act, or the Florida Constitution and Florida statutes to ensure that voting systems accommodated these disabled voters, or to provide absolute secrecy in voting. On October 16, 2002, the district court entered an order granting the Defendants' motion to dismiss the Plaintiffs' claims under the ADA, the Rehabilitation Act, and the Florida law. Am. Ass'n of People with Disabilities v. Smith, 227 F. Supp. 2d 1276, 1297–98 (M.D. Fla. 2002). The court explained that, to decide whether the Plaintiffs had been denied access to a public program—here, voting—in violation of the ADA, it first needed to define the scope of that program under Florida law. Id. at 1283. The Florida constitution requires that all votes be cast in a "direct and secret" manner. The court interpreted these terms broadly, and found that third-party assistance was consistent with casting a "direct and secret" ballot. Id. at 1285–87. Thus, the lack of accessible voting machines had not denied the Plaintiffs access to Florida's voting scheme. Id. at 1288. The court therefore dismissed the Plaintiffs' ADA claim "to the extent [the] Plaintiffs assert that they have been excluded from or denied the benefits of a program of direct and secret voting." Id. at 1297–98.

The district court, however, noted that the Plaintiffs might be able to allege violations under 28 C.F.R. §§ 35.151 and 35.160, and the ADA's general prohibition of discrimination, 42 U.S.C. § 12132. Id. at 1291–93. Accordingly, the court gave the Plaintiffs leave to file an amended complaint including further allegations supporting their ADA and Rehabilitation Act claims. Id. at 1298.

The Plaintiffs filed a two-count amended complaint on November 5, 2002, alleging violations of the ADA and the Rehabilitation Act. Again, the Plaintiffs alleged that the County's decision to purchase optical scanning machines discriminated against them because the optical scanning machines prevented the Plaintiffs "from fully exercising their right to cast independently a secret ballot in a manner the same as or similar to that used by non-disabled voters." Am. Compl. ¶ 59. And again, they alleged, this discrimination violated 42 U.S.C. § 12132 and the ADA's implementing regulations, 28 C.F.R. §§ 35.151(a)–(b) and 35.160(a)–(b).[9]

---

[9] The amended complaint also noted federal legislation that had become effective one week before its filing date. On October 29, 2002, President Bush signed into law the Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666 (codified at 42 U.S.C. §§ 15301–15545). In its Title III, HAVA required voting equipment used in federal elections to "be accessible for individuals with disabilities . . . in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters" by demanding "at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place." 42 U.S.C. § 15481(a)(3)(A)–(B). State and local voting authorities had to comply with the accessibility provision by January 1, 2006. Id. § 15481(d). HAVA provided funding for states to make improvements required by § 15481, id. § 15301, but by its terms did not supersede the ADA, id.

The district court convened a bench trial on the Plaintiffs' ADA and Rehabilitation Act claims on September 23, 2003. By this time, the district court had dismissed the City Council members from the case; the County's Supervisor of Elections, the Secretary of State, and the State Department's Director of the Division of Elections remained.[10]

The trial ended on October 1, 2003, and, on March 26, 2004, the district court issued a declaratory judgment and an injunction against the County's

_____

§ 15545.

[10] Their defense to the Plaintiffs' claims was that the handicapped-accessible voting machines provided by the Florida legislature would satisfy HAVA Title III—and therefore the ADA and the Rehabilitation Act to the extent that the Plaintiffs were contending that the latter two statutes applied to handicapped-accessible voting machines—and that appropriate steps were being taken in Duval County to meet HAVA Title III's requirements. The district court, in its 2004 order, rejected this defense and found that HAVA did not preempt the Plaintiffs' ADA claims. Am. Ass'n of People with Disabilities v. Hood, 310 F. Supp. 2d 1226, 1240 n.10 (M.D. Fla. 2004).

Indeed, the district court was correct. As explained in note 9, supra, HAVA specifically provides that its provisions shall not "be construed to authorize or require conduct prohibited under any of the following laws, or to supersede, restrict, or limit the application of such laws: . . . (5) The Americans with Disabilities Act of 1990." 42 U.S.C. § 15545.

Furthermore, complying with HAVA's requirement that every polling location have at least one handicap-accessible voting machine would not moot this case. According to the Plaintiffs' complaint, it was the decision to purchase optical-scanning machines, and not touch-screen machines, that violated 28 C.F.R. § 35.151(b)(1), see Am. Compl. ¶¶ 84–86, suggesting that their preferred outcome was a voting-machine fleet composed entirely of touch-screen machines. And elsewhere in the complaint the Plaintiffs indicate that the alleged violation occurred in the decision not to replace the punch-card system entirely with touch-screen machines. Id. ¶ 96 ("By ignoring Plaintiffs' request to certify only accessible voting systems, Defendants . . . have failed to give primary consideration to the requests of Plaintiffs . . . in determining the auxiliary aids and services to provide.").

9

Supervisor of Elections (the "2004 order").[11]  The court found that the Supervisor

of Elections, then John Stafford, had failed to satisfy the requirements of 28 C.F.R.

§ 35.151(b), which requires public entities, like the County, to make any facilities

altered after 1992 accessible to disabled individuals.[12]  Am. Ass'n of People with

Disabilities v. Hood, 310 F. Supp. 2d 1226, 1235–36 (M.D. Fla. 2004).  Without

analysis, the district court determined that voting machines were "plainly . . . within

the expansive definition of facility . . . .'"  Id. at 1235.  The court then proceeded to

explain that the County should have purchased accessible voting machines because

such machines were both technologically and financially feasible.  Id. at 1235–36.

In that same order, however, the district court rejected the Plaintiffs' claims based

on 28 C.F.R. § 35.160(b), which requires public entities to provide "auxiliary aids"

to ensure that disabled individuals can communicate effectively while participating

in public programs.  According to the court, third-party assistance provided the

Plaintiffs with "an equal opportunity to participate in and enjoy the benefits of

voting."  Id. at 1238–39.

---

[11]  Judge Alley presided over the trial and issued the declaratory judgment and injunction. See supra note 1.  The district court dismissed the Secretary of State and the State Department's Director of the Division of Elections from the case in the judgment entered on September 20, 2007, which reflected the 2004 order stating that the state officials would be entitled to judgment against the Plaintiffs upon submission of a final status report regarding the application of Diebold Elections Systems, Inc. for certification of its handicapped-accessible voting machines.

[12]  It also found the violation of § 35.151(b) simultaneously violated the ADA's statutory proscription of "discrimination" by public entities, 42 U.S.C. § 12132.  Id. at 1239–40.

10

Based on the violation of § 35.151(b), the court enjoined Stafford to provide, by April 12, 2004, at least one handicapped-accessible voting machine at twenty percent of the polling places in Duval County and to install, by May 14, 2004, an unspecified number of touch screen voting machines with audio capacity, as certified by the Department of State.[13]  Id. at 1241–42.

On March 31, 2004, Stafford initiated an interlocutory appeal of the 2004 order's injunction to this court.[14]  While Stafford's appeal was pending, Florida election officials took steps to certify and purchase handicapped-accessible touch-screen systems, and to install at least one of these machines in every voting precinct in Duval County.[15]  Given this information, on August 8, 2005, this court,

_____

[13]  Under Florida law, counties were, and still are, responsible for choosing the types of voting machines used in their precincts.  Any machines a county purchased had to be manufactured by a vendor approved by the Director of the Division of Elections and certified by the Director.  Fla. Stat. § 101.294.  Prior to the issuance of the 2004 order, Diebold Election Systems, Inc. applied to the Division of Elections for certification of its accessible touch screen voting machine, and the district court instructed the Secretary of State and the Director of the Division to submit a report detailing Diebold's application and disclosing the results of the tests performed on the machine by handicapped testers.  See supra note 11.  The report was submitted, and the district court dismissed these defendants from the case.

[14]  Stafford asserted that the case was moot because HAVA Title III superseded the ADA and the Rehabilitation Act, insofar as they might apply in the handicapped-accessible voting machine context.  This assertion is incorrect.  See note 10, supra.  Stafford further asserted that the district court's injunction was premature because he was in the process of implementing the provisions of Florida law addressing the handicapped-accessibility problem—legislation the district court approved in the 2004 order.  He also argued that, under HAVA Title III, he had until January 1, 2006, to complete the job.

[15]  The Director of the Division of Elections certified the touch screen system manufactured by Diebold Election Systems, Inc. for use in Florida.  The Florida legislature, in its

11

while retaining jurisdiction over the appeal, remanded the case to the district court to answer two questions of fact: (1) whether the City had a contract to provide Duval County with enough disabled-compliant voting machines to place one machine in each voting precinct, and (2) if a contract existed, whether the voting machines would be in place and ready for use by the next election. The district court held an evidentiary hearing and answered both questions in the affirmative. Based on the district court's answers, this court concluded that Stafford's appeal of the injunction was moot and, on August 17, 2007, entered an order dismissing it.[16]

On September 18, 2007, the district court ordered the Clerk of the District Court to enter a final judgment against Stafford in conformance with the 2004

---

2004–2005 General Appropriations Act, appropriated $11,600,000 to the counties to comply with HAVA Title III and Florida law on voting accessibility. The appropriation triggered the deadline for at least one Title III-compliant voting machine to be available in each precinct by July 1, 2005. In April 2005, the City of Jacksonville enacted an ordinance appropriating a $1,187,543.79 grant from the state to purchase at least one accessible voting machine for each precinct. On July 29, 2005, the City and Diebold entered into a purchase agreement for Diebold's touch screen machines.

[16] This order does not moot the present appeal. First, as noted in note 10, supra, the provision of accessible voting machines in twenty percent of the voting precincts would not moot the Plaintiffs' contentions under the ADA and its regulations. Second, our opinion was an interlocutory appeal only on the issue of the injunction, and said nothing about the propriety of the declaratory judgment. Thus, the case remains alive for us today.

order,[17] and the Clerk did so on September 20, 2007.[18] On October 4, 2007, Stafford moved the district court to vacate the September 20 judgment and to dismiss the case with prejudice.[19] On December 3, 2007, the district court entered an order denying his motion. The next day, Stafford appealed the district court's September 20 judgment and the December 3 order.[20]

Stafford argues, among other things, that voting machines are not "facilities" under § 35.151(b)(1), and therefore, that the County's purchase of new voting equipment did not trigger a requirement that the new machines be accessible to disabled voters "to the maximum extent feasible." Although the district court curtly concluded that voting machines are facilities, we are not similarly persuaded and must therefore vacate the district court's ruling.

## II.

---

[17] In the same September 18, 2007 order, the court denied the Plaintiffs' motion for attorney's fees and costs because a final judgment had not been entered, but gave the Plaintiffs leave to refile a motion for attorney's fees and costs within fourteen days after entry of the September 18 order.

[18] Judge Adams was the district judge who issued the September 18, 2007 order because the case had been reassigned to him. See supra note 1.

[19] Stafford moved the district court pursuant to Fed. R. Civ. P. 59(e).

[20] We have jurisdiction because the district court entered a final judgment as to the relief requested in Plaintiffs' amended complaint. 28 U.S.C. § 1291. Pending before the district court, and therefore not before us, are Plaintiffs' motions for attorney's fees and costs.

13

Title II of the ADA states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This provision provides private parties with a private right of action to enforce the ADA's protections. See Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1081 (11th Cir. 2007). To prevail, a private plaintiff must prove three elements:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of a pubic entity's services, programs, or activities,[21] or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

Id. at 1083 (citing Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001)).

The parties appear to agree that the Plaintiffs satisfy elements (1) and (3). At issue is whether the Defendants, by not providing accessible voting machines, have excluded the Plaintiffs from public programs, or discriminated against them. The district court, finding that the Plaintiffs satisfied this element, defined its

---

[21] This opinion will from refer to this provision—"excluded from participation in or denied the benefits of the public entity's services, programs, or activities"—simply as "excluded from public programs," or some variation of that phrase.

14

parameters using regulations promulgated by the Department of Justice (the

"DOJ") regarding the accessability or usability of public facilities.[22]

Section 35.149 of the implementing regulations ties inaccessible or unusable

facilities to discrimination and program exclusion. This section provides:

> Except as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

28 C.F.R. § 35.149.

The following sections, §§ 35.150 and 35.151, describe the different

treatment received by existing facilities and new/altered facilities, respectively.

Generally stated, existing facilities need not provide as extensive access as

new/altered facilities must provide. Existing facilities need not be altered if the

public "service, program or activity, when viewed in its entirety, is readily

accessible to and usable by individuals with disabilities." Id. § 35.150(a)(1). New

facilities, on the other hand, must themselves be constructed to be "readily

accessible to and usable by individuals with disabilities." Id. § 35.151(a)(1).

Similarly, altered facilities—if altered "in a manner that affects or could affect the

---

[22] The ADA gives the DOJ authority to promulgate regulations to enforce and implement the ADA's statutory protections. 42 U.S.C. § 12134.

usability of the facility or part of the facility"—must "to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." Id. § 35.151(b)(1).

The district court found that voting machines—not the physical locations serving as voting precincts—were "facilities" under these regulations. Under the district court's reasoning, because the County purchased new machines, the County had "altered" the voting-machine facility and therefore was under a duty to provide machines that were, "to the maximum extent feasible," usable by the Plaintiffs. The Defendants argue that voting machines are not facilities under §§ 35.149–151, and that the district court's judgment was therefore in error. We agree with the Defendants. The structure of the DOJ regulations, along with the DOJ's non-binding guidance and cases defining a "facility," suggest that only permanent, physical structures and the fixed items attached to those structures are "facilities" that may be "altered" under § 35.151(b).

### A.

The DOJ regulations define a "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." Id. § 35.104.

16

Read in isolation, "equipment" or "personal property" could, as the Plaintiffs contend, encompass voting machines; indeed, the district court stated without explanation that voting machines were facilities under the regulation.

But several aspects of these regulations suggest that only physical structures, and the permanent objects affixed to those structures, are "facilities" covered by the regulations. First, the DOJ commentary that came along with the definition of "facility" suggests that it applies only to permanent structures. According to the commentary, the term "facility . . . includes both indoor and outdoor areas where human-constructed improvements, structures, equipment, or property have been added to the natural environment." Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35,694, 35,700 (July 26, 1991). These terms imply that the "facility" refers to buildings, other property, and objects permanently added to that environment.

The regulations' distinction between existing facilities and new/altered facilities also refers to permanent, physical structures, and to objects affixed to those structures. Section 35.150(b) explains that public entities need not make "structural changes in existing facilities" if they can alter other aspects of their programs so that disabled individuals can access these programs. 28 C.F.R.

17

§ 35.150(b)(1). The commentary to this section again refers to the facilities' "structural changes":

> Structural changes in existing facilities are required only when there is no other feasible way to make the public entity's program accessible. (It should be noted that "structural changes" include all physical changes to a facility; the term does not refer only to changes to structural features, such as removal of or alteration to a load- bearing structural member.)

Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. at 35,709. The commentary then notes that, if the public entity does make any "structural changes undertaken to comply with this section," § 35.151's provisions apply to those structural changes. Id.

Section 35.151, which applies to new/altered facilities, is replete with terms that apply only to physical structures, and not to temporary, movable objects such as voting machines. For example, the provision regarding new facilities provides that "[e]ach facility or part of a facility constructed by . . . a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." 28 C.F.R. § 35.151(a)(1) (emphasis added). The reference to "commencing construction" most naturally applies only to permanent, physical structures; one would not say that, by ordering a new voting machine, a public entity has commenced construction of a new voting machine.

Similarly, the reference to "the facility or part of the facility" implies a physical space.

The requirements for altered facilities—the provision at issue here—likewise suggests that only permanent, physical structures are "facilities" that can be "altered." Like the provision for new facilities, altered facilities must, "to the maximum extent feasible, be altered in such manner that <u>the altered portion of the facility</u> is readily accessible to and usable by individuals with disabilities, if <u>the alteration was commenced</u> after January 26, 1992." Id. § 35.151(b)(1) (emphasis added). As the emphasized text shows, this provision uses the same language, evoking images of physical space as opposed to non-permanent and movable objects. The commentary makes similar references: "To the extent the buildings are newly constructed or altered, they must also meet the new construction and alteration requirements of § 35.151." Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. at 35,711.

Architectural concepts—terms usually reserved for physical structures—also appear in the DOJ's commentary. For example, when discussing whether a newly leased facility is considered an existing facility or a new facility, the commentary explains:

> Unlike the construction of new buildings where architectural barriers can be avoided at little or no cost, the application of new construction

19

standards to an existing building being leased raises the same prospect of retrofitting buildings as the use of an existing Federal facility, and the same program accessibility standard should apply to both owned and leased existing buildings.

Id. This section then provides examples of how an existing facility could be accessible to disabled individuals, and not require physical alteration. This hypothetical building would contain: "(1) One accessible route from an accessible entrance to those areas in which the principal activities for which the building is leased are conducted, (2) accessible toilet facilities, and (3) accessible parking facilities, if a parking area is included within the lease." Id.

The standards adopted to determine whether new/altered facilities are accessible further suggest that "facilities" are permanent physical structures. For example, the 2010 ADA Standards for Accessible Design[23] "apply to fixed or built-in elements of buildings, structures, site improvements, and pedestrian routes or vehicular ways located on a site." 28 C.F.R. § 35.151(d). These standards also define the term facility as "[a]ll or any portion of buildings, structures, site improvements, elements, and pedestrian routes or vehicular ways located on a site." U.S. Dep't of Justice, 2010 ADA Standards for Accessible Design § 106.5, at 46 (2010) (emphasizing defined terms), available at http://www.ada.gov/regs

---

[23] These standards are mandatory for any building built or altered after March 15, 2012. 28 C.F.R. § 35.151(c)(3).

20

2010/2010ADAStandards/2010ADAStandards_prt.pdf. And "element"—the only defined term that could encompass a voting machine—is an "architectural or mechanical component of a building, facility, space, or site." Id. (emphasis added). Accordingly, these standards primarily address the physical layout of buildings and the objects permanently located within those structures. See generally id.

Non-binding guidance from the DOJ also indicates that "facilities" refer to permanent physical structures—i.e., physical spaces—and not to movable objects like voting machines. A publication to guide cities explains that

> If a municipal building such as a courthouse is inaccessible, people with disabilities who use wheelchairs are unable to participate in jury duty, attend hearings, and gain access to other services, because doorways are too narrow, restroom facilities are inaccessible, and steps are the only way to get to all or portions of a facility.

U.S. Dep't of Justice, The ADA and City Governments: Common Problems 3 (emphasis added), available at http://www.ada.gov/comprob.pdf. Another publication, Common ADA Errors and Omissions in New Construction and Alterations, discusses permanent features related to buildings: parking, accessible routes around the building, curb ramps, ramps to doors, handrails for stairs, door features, bathrooms, visual alarms, drinking fountains, and objects (e.g., drinking fountains) protruding into pathways. U.S. Dep't of Justice, Common ADA Errors and Omissions in New Construction and Alterations (1997), available at

21

http://www.ada.gov/errors.pdf. Like the regulations' text quoted above, this publications suggests that a "facility" is simply a public building and the objects permanently affixed to the building, i.e., restroom facilities and drinking fountains.

And, most tellingly, a publication regarding polling locations discusses only the polling location's physical attributes. U.S. Dep't of Justice, ADA Checklist for Polling Places (2004), available at http://www.ada.gov/votingscrn.pdf. This guidance addresses concerns such as providing sufficient handicapped parking, id. at 5–8, temporary ramps if the facility has no curb ramps, id. at 11, and the positioning of voting booths within the polling place to ensure that disabled voters can get to the voting machines, id. at 32. Nowhere does the guidance prescribe standards for the voting machines themselves.

Finally, another publication—the Title II Technical Assistance Manual—provides context to the "personal property" prong of § 35.104's definition of "facility." As stated above, the regulations define "facility" to include "personal property." Although this term could suggest that movable objects are themselves "facilities," the technical assistance manual explains how "personal property" interacts with "facilities." It explains, "Where a public entity must provide an accessible route, the route must remain accessible and not blocked by obstacles such as furniture, filing cabinets, or potted plants." U.S. Dep't of Justice,

22

Title II Technical Assistance Manual § II-3.10000 (1993),

http://www.ada.gov/taman2.html (last visited Apr. 27, 2011).  This sentence

suggests that non-affixed personal property (the furniture, etc.) can impact

accessibility, but only to the extent that it blocks pathways within a building.

Thus, when placed in context, the "facilities" at issue in § 35.151(b) are

permanent, physical structures, and those objects affixed to that physical structure.

Voting machines, which are wheeled into—and out of—voting precincts on

election day, do not fall under this umbrella.

B.

Case law from the federal courts confirms this understanding of a facility.

These cases, generally speaking, have defined "facility" as having a connection to a

physical and permanent location.  In Molloy v. Metropolitan Transportation

Authority, 94 F.3d 808 (2d Cir. 1996), blind plaintiffs sued the public railroad,

claiming that the automated ticket vending machines purchased by the railroad had

altered the railroad station, but were not, to maximum extent feasible, readily

usable by the plaintiffs.[24]  Id. at 810.  The court of appeals agreed with the district

---

[24] The Molloy plaintiffs sued under a separate, but related, section of the ADA defining the duties of public transportation providers to accommodate passengers with disabilities, 42 U.S.C. § 12162(e)(2)(B)(i).  Molloy v. Metro. Transp. Auth., 94 F.3d 808, 812 (2d Cir. 1996).  The relevant statutory language describes the public duty in a nearly identical manner to 28 C.F.R. § 35.151(b):

23

court's conclusion that the installation of the ticket machines had altered the facility. Id. at 812. The court's reasoning tied the ticket machines' status as part of the "facility" to their connection with the station's physical plant: "The installation of a [ticket machine] constitutes a physical modification to the station. It also requires additional wiring and communication lines which feed into the [railroad's] central [ticket machine] monitoring facility. The above-quoted statutory and regulatory language suggests that such modifications are indeed encompassed by the statute." Id. (emphasis added).

Under similar logic, a district court found that automated teller machines ("ATMs") were "facilities" under the ADA. Massachusetts v. E*Trade Access, Inc., 464 F. Supp. 2d 52 (D. Mass. 2006). After evaluating interpretative guidance by the DOJ and the Access Board—another regulatory body—the court determined that anything "fixed or built into the structure of a building" falls under the rule's scope. Id. at 56–57 (citations omitted). The ATMs at issue were, in the court's

---

It shall be considered discrimination, for purposes of section 12132 of this title and section 794 of title 29, with respect to alterations of an existing station or part thereof in the intercity or commuter rail transportation systems that affect or could affect the usability of the station or part thereof, for the responsible person, owner, or person in control of the station to fail to make the alterations in such a manner that, to the maximum extent feasible, the altered portions of the station are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon completion of such alterations.

42 U.S.C. § 12162(e)(2)(B)(i) (emphasis added).

24

view, clearly facilities because they "are typically <u>physically embedded</u> in walls or floors so that they <u>cannot easily be removed</u> . . . and are hard-wired into a store's electrical system and telephone lines." <u>Id.</u> at 57 (emphasis added). Importantly, the court noted that there was "no evidence suggesting that any ATMs at issue in this case are movable structures not contemplated during the building process." <u>Id.</u>[25]

Fixed emergency-alarm boxes were also deemed a "facility" in <u>Civic Association of the Deaf of New York City, Inc. v. Giuliani</u>, 970 F. Supp. 352 (S.D.N.Y. 1997). There, deaf plaintiffs challenged the City's decision to utilize a new system of emergency-alarm boxes and remove older, handicapped-accessible boxes. <u>Id.</u> at 354. The older boxes were "located on approximately every second block throughout most areas of the City" and were presumably affixed to either a pole or the side of a building; the new boxes would also presumably be dispersed throughout the city at fixed locations. <u>Id.</u> at 356. And though the opinion does not

---

[25] The provision at issue here was Title III of the ADA, which regulated accommodations operated by private entities, 42 U.S.C. § 12183(a)(2). This section defines discrimination as

> with respect to a facility or part thereof that is altered by, on behalf of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, a failure to make <u>alterations</u> in such a manner that, <u>to the maximum extent feasible</u>, the altered portions of the facility <u>are readily accessible to and usable by individuals with disabilities</u>, including individuals who use wheelchairs. . . .

42 U.S.C. § 12183(a)(2) (emphasis added).

explain whether wires connected the boxes with law enforcement, the boxes were clearly part of the City's fixed—though replaceable—infrastructure.[26]

Movable shelving, in contrast, was not considered part of the "facility" in Colorado Cross-Disability Coalition v. Too (Delaware), Inc., 344 F. Supp. 2d 707 (D. Colo. 2004).[27] In Too, the plaintiffs sued a retail clothing store because the store's movable shelving, which the defendants frequently re-arranged, allegedly limited their access to the store. Id. at 708. The plaintiffs argued that re-arranging the movable shelving "altered" the facility and therefore the defendants were required to meet the higher accessibility standards for altered facilities.[28] Id. at 709, 711. The defendants countered that movable shelving was not part of the facility and that re-arranging the movable shelves did not alter the store's physical plant (i.e., the facility); therefore, the more lenient standards for existing facilities

---

[26] The district court's opinion in Civic Association of the Deaf of New York City, Inc. v. Giuliani, 970 F. Supp. 352 (S.D.N.Y. 1997), contains some language regarding Molloy that could be misconstrued. The Giuliani court analogized to Molloy's discussion of ticket machines, stating, "the [Molloy] [c]ourt held that the installation of ticket vending machines, even though the machines were moveable, was an 'alteration' within the meaning of the ADA." Giuliani, 970 F. Supp at 359 (citing Molloy, 94 F.3d at 812) (emphasis added). Neither Molloy's ticket machines nor Giuliani's emergency boxes were truly "movable"; their locations were fixed and they were connected to a broader infrastructure.

[27] The provisions at issue here were 42 U.S.C. §§ 12182(b)(2)(A)(iv) and 12183(a)(1).

[28] 42 U.S.C. § 12183(a)(1) states that, for new facilities, "discrimination" includes "a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities." (emphasis added).

26

applied.[29]  Id. at 710.  The district court found that movable shelves were not part of the facility, and explained that the ADA required stricter compliance standards for new buildings because "it costs far less to incorporate accessible design into the planning and constructing of new buildings" than it does to retrofit existing structures.  Id. at 711 (quoting H.R. Rep. No. 101-485(III), at 60 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 493).  This logic did not apply to movable structures because their arrangement did not affect the cost of altering the store's physical plant.  Id. at 711–12.

Put together, these cases explain that "facilities" include objects that, while movable in the abstract, are placed in a fixed location and connected to broader infrastructure.  So, the ticket vending machines in Molloy and the ATMs in E*Trade are facilities—and therefore must comply with § 35.151—because they were "fixed or built into the structure of a building."  E*Trade, 464 F. Supp. 2d at 57.  Voting machines, in contrast, are movable and exist in the buildings serving as

---

[29]  42 U.S.C. § 12182(b)(2)(A)(iv) states that, for existing facilities,

> discrimination includes . . . a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable.

(emphasis added).

voting precincts only for that one day.  In that sense, voting machines are much more like the movable shelving in Too, rather than the ATMs in E*Trade.[30]

## C.

Our conclusion that voting machines are not "facilities" does not leave disabled voters in the lurch.  As a public program, disabled citizens must be able to participate in the County's voting program.  See 42 U.S.C. § 12101(a)(3) (finding that "discrimination against individuals with disabilities persists in such critical areas as . . . voting[] and access to public services"); Tennessee v. Lane, 541 U.S. 509, 524, 124 S. Ct. 1978, 1989, 158 L. Ed. 2d 820 (2004) (finding "a pattern of unequal treatment in the administration fo a wide range of public services, programs, and activities, including . . . voting").

Accordingly, the Plaintiffs alleged not only a violation of § 35.151(b), but also of § 35.160.  That regulation requires public entities to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of" public

---

[30] We note that two other district courts have found that voting machines are facilities and therefore are subject to § 35.151's provisions.  Troiano v. Lepore, No. 03-cv-80097, slip op. at 10 n.4 (S.D. Fla. May 3, 2003); Nat'l Org. on Disability v. Tartaglione, No. CIV. A. 01-1923, 2001 WL 1231717, at *5 (E.D. Pa. Oct. 11, 2001).  We find neither opinion persuasive.  Not only are the relevant analyses cursory, but Troiano also cites both Tartaglione and the district court's 2002 order, Am. Ass'n of People with Disabilities v. Smith, 227 F. Supp. 2d 1276 (M.D. Fla. 2002), for its position.

28

programs, such as voting.  28 C.F.R. § 35.160(b)(1).  "Auxiliary aids" include

"[q]ualified interpreters . . . ; notetakers; . . . [q]ualified readers; . . . and . . . [o]ther

similar services and actions."  28 C.F.R. §35.104.  The Technical Assistance

Manual illustrates how public entities can assist disabled voters:

> [County X's] Supervisor of Elections provides magnifying lenses and
> readers for individuals with vision impairments seeking to vote.  The
> election procedures specify that an individual who requests assistance
> will be aided by two poll workers, or by one person selected by the
> voter. . . . Because County X can demonstrate that its current system of
> providing assistance is an effective means of affording an individual
> with a disability an equal opportunity to vote, the County need not
> provide ballots in Braille.

U.S. Dep't of Justice, Title II Technical Assistance Manual 1994 Supplement § II-

7.1100 (1994), http://www.ada.gov/taman2up.html (last visited Apr. 27, 2011).

Therefore, the County could not merely enable the Plaintiffs to reach the voting

machine, but leave them to vote unassisted; it needed to make sure that the

Plaintiffs could read the ballot and communicate their choice (i.e., vote).

Indeed, the district court found that the County did not violate § 35.160

because the Plaintiffs were able to participate in Florida's voting program.  Hood,

310 F. Supp. 2d at 1236–39.  The County provides third-party assistance to

disabled voters such as the Plaintiffs; a person at the polling location reads the

ballot to the disabled voter and marks that voter's preferred candidate.  Although

the Plaintiffs professed fears that this system was ineffective, the district court

found that the "Plaintiffs presented no evidence that communication with visually and manually impaired voters is not as effective as communication with non-disabled voters." Id. at 1238. Accordingly, the Plaintiffs "have been afforded an equal opportunity to participate in an enjoy the benefits of voting." Id. This finding, which the Plaintiffs did not appeal, assures us that the Plaintiffs' rights under the ADA have not been abused.

We also note that, although § 35.151(b) may not require accessible voting machines, another federal law appears to have done just that. HAVA, which became law in 2002, requires States to provide a voting system that is "accessible for individuals with disabilities . . . in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters." 42 U.S.C. § 15481(a)(3)(A). Under the law, each polling place must have at least one handicapped-accessible voting machine. Id. § 15481(a)(3)(B).[31] The

---

[31] As explained in note 10, supra, HAVA does not preempt, supercede, or moot the Plaintiffs' ADA claims. Nevertheless, several State election officials have interpreted the HAVA as having filled a gap left by the ADA, meaning that the ADA does not encompass voting machines. See, e.g., Ohio Sec'y of State, Accessible Locations, http://www.sos.state.oh.us /SOS/elections/voterInformation/voterswithdisabilities/ADAaccess.aspx (last visited Apr. 27, 2011) (explaining that the ADA requires that voters have access to the polling location and the voting procedures, whereas HAVA requires that the polling locations have accessible voting machines).

Plaintiffs therefore will be able to use accessible voting machines, just not under the guise of 28 C.F.R. § 35.151(b).[32]

## III.

For the foregoing reasons, voting machines are not "facilities" under 28 C.F.R. § 35.151(b), and the district court erred by granting the Plaintiffs relief on that basis. We therefore VACATE its judgment of September 20, 2007, and REMAND the case to the district court with the instruction to vacate the injunction and enter a final judgment dismissing this case with prejudice.[33]

SO ORDERED.

---

[32] We note that the Plaintiffs also claimed that the lack of accessible voting machines violated their rights directly under the ADA's general prohibition against discrimination, 42 U.S.C. § 12132. The district court did not independently analyze that issue, finding that its resolution of the § 35.151(b) claim also resolved the Plaintiffs' statutory claim. Hood, 310 F. Supp. 2d at 1340 ("Plaintiffs' 'generic' discrimination claim appears to be coterminous with its claim under 28 C.F.R. § 35.151."). On appeal, the parties litigated this issue similarly; neither party provided an explanation of § 12132's prohibition independent of the regulation's provisions for facilities. We follow the district court's and the parties' lead; our conclusion that the Plaintiffs cannot bring a claim under § 35.151(b) likewise disposes of their statutory discrimination claim.

[33] As indicated in notes 17 and 20, supra, pending in the district court are the Plaintiffs' motions for attorney's fees and costs. The ADA's attorney's fee provision requires a party to prevail in order to receive an attorney's fees. 42 U.S.C. § 12205. The Plaintiffs cannot recover here on the ground that they prevailed, for they did not. Nor can they recover their attorney's fees for serving as a "catalyst," i.e., that they caused Stafford to implement the changes they sought. Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 610, 121 S. Ct. 1835, 1843, 149 L. Ed. 2d 855 (2001) (rejecting the "catalyst" theory), superseded in part by statute, OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524 (2007) (codified at 5 U.S.C. § 552(a)(4)(E)) (amending the fee-shifting provision of the Freedom of Information Act but not the ADA). Accordingly, this case has ended.